# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2010-DP-00425-SCT

*JASON LEE KELLER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/08/2009 |
| TRIAL JUDGE: | HON. LISA P. DODSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: ALISON R. STEINER |
| | ANDRE DE GRUY |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JASON L. DAVIS |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 02/06/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     Jason Lee Keller appeals his conviction for capital murder; finding no reversible error, we affirm.

¶2.     On March 21, 2008, Jason Lee Keller was indicted for capital murder while in the commission of robbery. On October 5, 2009, a jury trial commenced in the Circuit Court of Harrison County, Second Judicial District, with the Honorable Lisa P. Dodson presiding.

The jury returned a verdict of guilty on the capital murder charge on October 7, 2009. After a separate sentencing hearing, the jury found beyond a reasonable doubt that the following facts existed at the time of the commission of the capital murder: that Keller intended to kill Hat Thi Nguyen, that Keller attempted to kill Nguyen, and that Keller did kill Nguyen. The jury unanimously found the following aggravating circumstances: the capital offense was committed in the commission of a robbery; the capital offense was committed to avoid or prevent a lawful arrest; and Keller previously had been convicted of a felony involving the threat of violence to a person.

¶3. Subsequently, Keller filed a motion for new trial, followed by an amended motion for a new trial, both of which were denied. Keller then timely filed the instant direct appeal. The Court entered an *en banc* order on February 15, 2013, remanding the case to the Circuit Court of Harrison County to conduct a supplemental evidentiary hearing on the questions of whether any of the three statements made by Keller to law enforcement officers was coerced, and, if so, whether any information learned in a coerced confession was used to gain additional information from Keller. On remand, the trial court found that none of the statements had been coerced and – even if the first two were – that the third statement was sufficiently removed from them to render it admissible. Having retained jurisdiction, the Court will address Keller's issues on appeal.

## FACTS AND PROCEDURAL HISTORY

¶4. On the morning of June 21, 2007, someone shot and killed Hat Thi Nguyen ("Hat") inside Food Mart, a convenience store she owned in Biloxi, Mississippi. A customer, Terri Muffi, found her. Muffi saw a pack of cigarettes lying on the floor and noticed that the cash

register was not completely closed. Upon looking behind the counter, Muffi noticed a woman lying on the floor, so she rushed behind the counter and called 911.

¶5. An owner of a neighboring business, Teo Nguyen (no relation) ("Teo"), entered the store and immediately noticed a distressed woman behind the counter on the telephone. Muffi asked Teo the name of the store. He went outside to confirm that the store was named Food Mart. Shortly thereafter, Teo saw Hat lying on the floor behind the counter and became concerned about her children. He walked to the rear of the store and called for them but received no answer. Teo went back to the front of the store and took the telephone from Muffi so he could speak with the 911 operator. Muffi proceeded to perform cardiopulmonary resuscitation (CPR) on Hat. On the witness stand at trial, Teo recalled that it appeared as though there had been a struggle between Hat and her attacker. He also noticed that the cash register was damaged.

¶6. Within minutes of the 911 call, first responders were on the scene, including Sergeant Darryl Montiforte of the Biloxi Police Department. Montiforte recalled that, upon his arrival on the scene, a woman (later identified as Muffi) was performing CPR on Hat. Hat did not appear to be responding and did not have a pulse. Montiforte discovered Hat's son, unharmed, sleeping in the rear of the store. Montiforte testified that the cash register appeared to be undamaged and closed.

¶7. On the morning of the shooting, Keller, having wrecked and abandoned a stolen truck, set out on foot in possession of a stolen gun before stopping by Hat's store for cigarettes. Keller recounted to Investigator Michael Brown in his third statement, which was admitted into evidence:

3

KELLER: . . . . Don't know why I did it, but I did it. I asked her for a pack of cigarettes. When she turned around, I pulled my gun out and when she turn back around, I told her give me all the money. She started screaming no. I just shot her . . . .

Keller recalled that he had shot her "once or twice" before she ran out the door of the convenience store (although he could not remember exactly how many times he had shot her), and he had followed her out of the store with the gun. She told him she would give him all the money in the store, so they returned inside the store. Keller then shot her again. Hat fell to the floor, at which point Keller shot her one final time at close range (referred to by the forensic pathologist as "contact range") in the back of the head. Keller retrieved the money from the register before fleeing on foot to his stepfather's house, where he stole a second truck. Keller then went to a bank to cash the rolls of change he had stolen from the convenience store. Surveillance tape at Keesler Federal Credit Union confirmed that Keller had come into the bank with rolls of change to exchange them for cash. Keller then proceeded to a "crack house." Having sold the stolen gun used in the shooting in exchange for crack cocaine, Keller remained at the house smoking crack cocaine until nightfall. He then left in the stolen truck, driving around until police attempted to pull him over. After initially refusing to yield to police pursuit, Keller finally stopped the vehicle. When he exited the vehicle, Keller, attempting suicide, pointed a metal object that resembled a shotgun barrel at the police to induce them to shoot him. He was shot by arresting officers and transported to Biloxi Regional Medical Center. While in the emergency room, officers attempted to interrogate him on two different occasions. The day after his shooting, Investigator Brown

4

of the Biloxi Police Department conducted a recorded police interview with Keller while he was being treated in the intensive care unit (ICU) at Biloxi Regional.

¶8.    At trial, without objection by the defense, the State tendered Dr. Paul McGarry as an expert witness in forensic pathology.  Dr. McGarry testified that Hat had four gunshot wounds in her body.  He identified a gunshot wound to her abdomen (wound C) as nonfatal, because it had not penetrated any vital structures.  He testified that, after the initial gunshot, Hat still would have been able to walk, talk, think, and engage in movement (though in pain). Dr. McGarry identified gunshot wound A, a shot that entered Hat's head about four inches above her right ear canal but stayed beneath the scalp and did not penetrate her skull or brain. Dr. McGarry testified that wound A also had been a nonfatal wound that likely would have stunned her and knocked her down but would not have paralyzed her or seriously damaged her brain.  According to Dr. McGarry, gunshot wound D went into the brain itself.  It would have done more serious damage by decreasing the degree of consciousness and/or rendering her unconscious, along with causing her to suffer brain damage.  However, she still would have been able to move the muscles and use the nerves of her extremities.  Finally, he described a gunshot wound in which the bullet entered the base of the skull where the spinal cord connects to the brain and traveled to her cerebellum, labeled wound "B."  That shot was identified as the fatal one.

¶9.    Keller was indicted by a grand jury for capital murder as a nonhabitual offender on March 31, 2008.  On May 6, 2008, the State filed a motion to amend the indictment, seeking to charge Keller as a habitual offender pursuant to Mississippi Code Section 99-19-83. Keller maintains that he did not receive notice of the motion, nor did he receive a hearing on the

5

motion.  He further contends that he was not appointed counsel at the instant stage of the proceedings.  On June 6, 2008, Judge Jerry O. Terry granted the State's motion.  Keller was appointed counsel on June 11, 2008.

¶10.   Judge Clark[1] presided over an omnibus hearing on August 27, 2009, during which arguments were heard from both parties on Keller's motion to suppress statements that he had made to police during his hospitalization.  Keller had given statements to police in the emergency room and in the ICU.  The trial judge granted Keller's motion in part, suppressing statements Keller had made to police while being treated in the emergency room but not suppressing statements Keller had made to police while in the ICU.

¶11.   Jury selection in the trial commenced on October 5, 2009. Trial began immediately thereafter, resulting in a jury verdict of guilty of capital murder, on October 7, 2009, after just over thirty minutes of deliberation.  The jury returned a sentence of death on October 8, 2009.  Keller timely filed a direct appeal.

¶12.   After oral argument, the Court entered an *en banc* order on February 15, 2013, remanding the case to the Circuit Court of Harrison County to conduct a supplemental evidentiary hearing to determine whether "any one or more of the statements Keller made to law enforcement was coerced and, if so, whether any information gained in any coerced statement assisted law enforcement in gaining additional information from Keller in any statement that was not coerced."

---

[1]By the time of trial, Judge Clark was unable to preside and the Honorable Lisa P. Dodson was substituted as the presiding trial judge. She expressly adopted all prior rulings made by Judge Clark.

¶13.    Upon remand, the trial court allowed the parties to introduce evidence as they deemed necessary to assist in making a determination of the two issues, including hearing testimony from the State's witness, Dr. Gregory F. Bredemeier, who was Keller's emergency room doctor; and Keller's witness, Dr. Joseph A. Jackson, who is board certified in neurology, psychiatry, sleep disorders, pain management, and medical acupuncture.  Dr. Bredemeier testified that, while Keller was in pain, he was alert and supplied information as was needed. He also testified that the amount of morphine that Keller received was not enough to make him incoherent or to compromise his ability to understand what was going on around him. Dr. Jackson had not treated or examined Keller, but he did review the medical statements and prior testimony.  He testified that Keller was not competent to waive his *Miranda* rights in the first two statements due to the pain and discomfort he was experiencing.[2]  Further, he testified that the officers coerced Keller when they coupled their questions with statements that they would "see what they could do" as to getting Keller some water at a time when it was not medically reasonable to do so.  Dr. Jackson also believed that when the officer said that he didn't know what the next few minutes or hours would hold in store for him, Keller was being coerced.

¶14.    After both parties rested, the trial court rendered its opinion, holding that

> none of the statements given by Jason Lee Keller were "coerced" by the improper actions of the investigating law enforcement officers. Further, the Court finds that even if the first two statements are held to be "coerced," the third statement was freely and voluntarily given after an intelligent and knowing waiver of Keller's rights under *Miranda* and sufficiently removed and distinguishable from the conditions present during the first two statements

---

[2] *See **Miranda v. Arizona***, 384 U.S. 436 (1966).

7

to be "purged of the primary taint," if any, of those statements. Finally, the Court finds that the information obtained in the first two statements was not "used to obtain additional information" from Keller in the third statement.

Having retained jurisdiction, the Court must now make a ruling on Keller's arguments on appeal.

## ISSUES [3]

I.    **Whether constitutional flaws in the process by which Keller was accused and tried irrevocably tainted his conviction and death sentence and require reversal of both.**

    A.    **Whether repeated violations of the order granting full recordation of all proceedings in this matter deprived Keller of a fair trial.**

    B.    **Whether repeated exclusion of Keller from critical stage proceedings also prejudiced his fundamental Sixth and Fourteenth Amendment rights to presence and a fair trial.**

    C.    **Whether amendment of the indictment in this matter by *ex parte* action when Keller was unrepresented and without notice was prosecutorial misconduct and deprived Keller of his Fifth, Sixth, and Fourteenth Amendment protections.**

    D.    **Whether payment of excess compensation to State's witness Terry Ann Muffi and her nontestifying traveling companion was similarly prosecutorial misconduct, and violated Keller's rights to due process and to confrontation of witnesses.**

II.   **Whether the jury selection process was constitutionally infirm and requires reversal of Keller's conviction and sentence of death.**

    A.    **Whether exclusion of Keller from off-record voir dire was unconstitutional and prejudicial.**

---

[3]The issues are listed verbatim from Keller's brief-in-chief with the exception of issue III, which has been changed to accommodate the analysis from the trial court's opinion on remand.

B.      Whether the trial court improperly limited defense voir dire relating to juror understanding of the sentencing process and exacerbated the harm by off-record resolution of the objections resulting in those limitations.

C.      Whether the trial court improperly removed prospective jurors qualified to serve under *Witherspoon*.

D.      Whether the trial court deprived Keller of his right to a fair and impartial jury by seating Juror 5, Glenn Anderson, who failed to reveal material information during jury qualification and voir dire at any time prior to being selected as a juror.

III.    Whether the trial court erred in failing to suppress the final statement elicited from the defendant at Biloxi Regional Medial Center by law enforcement officers.

A.      Whether the trial court erroneously applied controlling "fruit of the poisonous tree" jurisprudence in not suppressing Keller's third statement to police.

B.      Whether the trial court's conclusions of law in the Remand Opinion concerning coercion and its effect on Keller's third statement to police are contrary to controlling law and unsupported by the record.

C.      Whether Keller's invocation of his right to silence during questioning in the ER was not honored by police when they resumed his interrogation in the ICU.

D.      Whether, even if treated *sui generis*, the *Miranda* warning and waiver obtained prior to the third statement were insufficient and invalid.

IV.     Whether prosecutorial misconduct and erroneous rulings by the trial court caused the jury to receive inadmissible information during the culpability phase of the trial which requires reversal of Keller's conviction of capital murder.

A.     Whether the trial court erred in denying Keller's Rule 404(b) motion to exclude concerning alleged vehicle thefts for which Keller was separately indicted.

B.     Whether the trial court erred in allowing the jury to read along with a transcript while they were listening to the audio recording of Keller's statement.

C.     Whether the trial court erred in admitting, over Keller's objection, prejudicially gruesome photographs, and a cumulative and gruesome diagram prepared by the pathologist.

D.     Whether the State committed prosecutorial misconduct during the culpability phase of the trial by adducing and arguing improper victim impact evidence and other unnecessary and inflammatory evidence concerning the suffering of and injuries to the decedent.

E.     Whether much of Dr. Paul McGarry's testimony was also outside the scope of his expertise and/or admittedly unsupportable by the facts of records and was therefore inadmissible for any purpose.

F.     Whether the prosecution's reference in its opening statement to multiple "statements" given by Keller violated the trial court's suppression order and the Fifth and Sixth Amendments of the United States Constitution.

V.     Whether the culpability phase verdict was also constitutionally flawed by improper instructions and premature and insufficient deliberation by the jury and must be revised.

A.     Whether the trial court erred in denying Keller's requested Instructions D-9, D-10, and D-11 on noncapital murder and manslaughter.

B.     Whether the jury engaged in premature deliberations as to guilt prior to conclusion of the evidence or receipt of instructions, and followed that with an absence of meaningful deliberation at the time the case was consigned to them, which requires reversal here.

10

**VI.** Whether the trial court erroneously permitted the state to present improper matters to the jury during the penalty phase proceedings and precluded Keller from responding to the state's evidence at that phase.

    **A.** Whether the jury received inadmissible, inflammatory evidence and argument concerning four prior non-violent felony convictions which prejudicially influenced its verdict.

    **B.** Whether the victim impact testimony offered by the State went beyond the limited scope permitted by law, and requires reversal of the sentence as a consequence.

    **C.** Whether the trial court compounded the prejudice created by admission of this improper evidence by erroneously limiting Keller's ability to refute inferences of non-statutory aggravating factors that were not supported by law and/or the facts.

**VII.** Whether the trial court erred in the instructions to the jury at the sentencing phase and reversal is required as a consequence.

    **A.** Whether the trial court's sentencing instruction improperly permitted the jury to consider aggravating factors that were not supported by law and/or the facts.

    **B.** Whether the trial court erroneously refused Keller's requested sentencing phase instructions D SP-2, 6, 7 and 8.

**VIII.** Whether the penalty phase was further rendered fundamentally unfair by the failure of the trial court to insure a constitutionally sufficient process.

    **A.** Whether matters conducted off-record in the sentencing phase were a violation of Keller's rights for the reasons discussed in Argument I, *supra.*

    **B.** Whether the trial judge erred in handling the off-record receipt of a jury note indicating premature sentencing deliberation by at least one juror when evidence was still being received, and similarly failed to make a contemporaneous record of two additional jury notes received during sentencing deliberation.

IX. **Whether the death sentence in this case must be vacated because it was imposed in violation of the Constitution of the United States.**

    A. **Whether the failure to include aggravating circumstances in [the] indictment renders the sentence unconstitutional and requires that it be vacated.**

    B. **Whether the scienter provisions of the Mississippi capital sentencing statute are unconstitutional and void, and Keller's death sentence is therefore without any legal basis and must be vacated.**

    C. **Whether duplicative use of the robbery which was relied upon to render the homicide capital murder as a statutory aggravating factor making Keller eligible for the death penalty and weighing against mitigation at sentencing violates the Constitution.**

    D. **Whether the execution of Keller pursuant to the sentence in this matter will violate *Baze v. Rees* and the death sentence must be set aside as a result**.

    E. **Whether the Mississippi statute is unconstitutional for additional reasons, as well.**

X. **Whether the death sentence in this matter is constitutionally and statutorily disproportionate.**

XI. **Whether the cumulative effect of the errors in this trial court mandates reversal of either the verdict of guilt or the sentence of death.**

XII. **Except as raised to preserve substantive errors discussed in arguments I through XI, issues relating to ineffective assistance of trial counsel are not fully apparent from the record, and the right to raise such issues is reserved.**

## STANDARD OF REVIEW

¶15. "[T]his Court applies heightened scrutiny to capital-murder convictions where a sentence of death has been imposed." *Fulgham v. State*, 46 So. 3d 315, 322 (¶ 16) (Miss.

2010) (citing *Bishop v. State*, 812 So. 2d 934, 938 (Miss. 2002)). "We repeatedly have ruled that '[w]hat may be harmless error in a case with less at stake [may become] reversible error when the penalty is death.'" *Id.* (quoting *Bishop*, 812 So. 2d at 938).

¶16.   In reviewing the trial court's denial of a petitioner's motion to suppress confessions, "we apply the familiar general rule that since the trial court sits as the fact-finder when determining the issue of whether an accused's confession has been intelligently, knowingly and voluntarily given, we will only reverse the trial court's determination of this issue when such determination is manifestly wrong." *Glasper v. State*, 914 So. 2d 708, 716 (¶ 21) (Miss. 2005).   "[W]e will not disturb the trial court's determination on the admissibility of a confession unless the trial court applied an incorrect legal standard, committed manifest error, or rendered a decision which was contrary to the overwhelming weight of the evidence." *Id.*

### DISCUSSION

I.   **Whether constitutional flaws in the process by which Keller was accused and tried irrevocably tainted his conviction and death sentence and require reversal of both.**

*Incomplete transcription of proceedings*

¶17.   Keller asserts that numerous proceedings, including bench jury qualification and voir dire, bench objection conference, recess proceedings with judge and attorneys, jury strikes and selections, receipt of jury notes, and other matters were conducted off-record. Keller maintains that the omissions violated both the Court's longstanding condemnation of off-record proceedings and an order entered by the trial court that all such matters be recorded. *See Suan v. State*, 511 So. 2d 144, 147 (Miss. 1987) ("[W]e direct without equivocation that

13

court reporters should *never* fail to preserve for record at-the-bench or chambers conferences following objections such as have been made. The trial judge has the responsibility to enforce this directive."); *see also* **Smith v. State**, 877 So. 2d 369, 392 (¶ 70) (Miss. 2004) (reaffirming the Court's pronouncement in **Suan**). Conversely, the State contends that Keller should have contemporaneously objected to the failure of the court reporter to make a complete transcription or the failure of the court to follow its own omnibus order, granting Keller's pretrial motion to record all proceedings.

¶18. Keller asserts that his failure to object when the order was not followed at trial does not serve as a procedural bar, because he had filed a motion *in limine* asking that all proceedings be recorded, which was granted by the trial court. Keller cites **Goff v. State**, 14 So. 3d 625 (Miss. 2009), to support his argument that the Court has held that motions *in limine* preserve a defendant's right to appeal an alleged error, even in the absence of a contemporaneous objection. In **Goff**, we stated, "[t]his Court has held that a defendant's motion *in limine* regarding the introduction of evidence properly preserved the issue for appeal, and an objection was not necessary." **Goff**, 14 So. 3d at 640 (¶ 46) (citing **Kettle v. State**, 641 So. 2d 746, 748 (Miss. 1994)). However, **Goff** was limited to motions to suppress evidence. Accordingly, the matter has not been properly preserved for appeal due to the absence of a contemporaneous objection by the defendant at trial to failure on the part of the court reporter to record all of the proceedings. *See* **Smith v. State**, 724 So. 2d 280, 302 (¶ 69) (Miss. 1998) (reiterating that a contemporaneous objection must be made to preserve an alleged point of error for appeal) (quoting **Davis v. State**, 660 So. 2d 1228, 1251 (Miss. 1995)).

¶19. In an attempt to supplement the record, Keller filed a motion to correct and reconstruct these off-record occurrences on February 18, 2011, almost one year after a designation of the record was filed on March 12, 2010, and the actual record was filed with the Court on July 20, 2010, after appellate counsel was substituted for trial counsel. Despite having agreed with the State that the motion was untimely under Mississippi Rule of Appellate Procedure 10(c), the trial court took up Keller's motion at a hearing on April 4, 2011. At the hearing, portions of the record were reconstructed and/or recounted at the hearing by the trial judge, with counsel for both parties present and participating. Keller argues that any attempt on the part of the trial court either during trial or post-trial to reconstruct off-record proceedings was insufficient and warrants reversal of the conviction.

¶20. In opposition, the State argues that Keller's issue also is procedurally barred for failure to follow Mississippi Rule of Appellate Procedure 10(c), which provides the appropriate procedure for modifying the record on appeal when "no stenographic report or transcript of all or part of the evidence or proceedings is available." In that instance, an appellant may prepare a statement of the evidence or proceedings from recollection. Miss. R. App. P. 10(c). The statement of the evidence or proceedings must be "certified by the appellant or his counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 60 days after filing the notice of appeal," and must be served upon the appellee. *Id.* A failure to follow the procedure results in a procedural bar to raising the issue of an incomplete transcript on appeal. ***Simmons v. State***, 805 So. 2d 452, 506 (¶ 157) (Miss. 2001) (citing ***Watts v. State***, 717 So. 2d 314, 317 (Miss. 1998)). Keller never

15

filed a statement of the evidence or proceedings from recollection. He has failed to preserve the issue on appeal for failure to object contemporaneously and failure to follow Rule 10(c).

### Exclusion from critical proceedings

¶21. Keller maintains that he was excluded from several off-record bench conferences and conferences in chambers, including voir dire examination conducted at the bench. Eleven venire members were questioned by the trial judge at the bench. For three of these venire members, the defense made the decision as to whether or not they served on the jury, and one actually served on the jury. Keller maintains his exclusion violated his Sixth-Amendment right to be present at critical stages of the trial. Moreover, he argues that the failure of his attorney to object was "a constitutionally ineffective reaction to this deprivation" which resulted in prejudice to his defense.

¶22. Conversely, the State argues that he is procedurally barred from making the argument. Alternatively, the State asserts that the argument is without merit, because the defendant has no Sixth Amendment right to be present during bench conferences.

¶23. "A criminal defendant's right to be present at 'critical stages' does not include the right to be present during bench conferences and the conference on jury instructions, since those matters are purely legal and the criminal defendant can do little to aid his defense. It is sufficient that his counsel is present." *Jordan v. State*, 786 So. 2d 987, 1022 (¶ 126) (Miss. 2001) (citing *Smith v. State*, 724 So. 2d 280, 308-12 (Miss. 1998)). Accordingly, the issue is without merit.

### Amendment of the indictment

¶24.    Keller argues that the process by which his indictment was amended violated his Sixth Amendment right to presence at all critical stages of the proceedings, as well as his right to counsel. *See Brewer v. Williams*, 430 U.S. 387, 398 (1977) ("[T]he right to counsel granted by the Sixth and Fourteenth Amendments means . . . a person is entitled to . . . a lawyer at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'") (quoting *Kirby v. Illinois*,  406 U.S. 682, 689 (1972)).  Keller avers that such an "[a]mendment shall be allowed only if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised." *Adams v. State*, 772 So. 2d 1010, 1020 (Miss. 2002) (quoting URCCC 7.09).  Keller contends that the trial court should not have allowed for the amendment of the indictment without notice to Keller and without a hearing on the motion, at which Keller should have been represented by counsel.  In support of his argument, Keller cites *Sharp v. State*, 240 Miss. 629, 127 So. 2d 865, 869, *error overruled,* 129 So. 2d 637 (Miss. 1961):

> The essential elements of due process of law are notice and an opportunity to
> be heard and to defend in an orderly proceeding adapted to the nature of the
> case before a tribunal having jurisdiction of the cause.

Keller maintains that the trial court's order granting the amendment was an improper *ex parte* order[4] and that the prosecutor violated ethical rules in obtaining the order,[5] especially from

---

[4]Keller contends that the *ex parte* order is an untoward consequence of a delay in appointing him counsel. *See Johnson v. State*, 631 So. 2d 185, 188 (Miss. 1994).

[5]Keller cites the comment to Mississippi Rule of Professional Conduct 3.8 that states a prosecutor is not merely a party in litigation, but also a "minister of justice," a job which "carries with it specific obligations to see that the defendant is accorded procedural justice . . . ."

a judge who was not otherwise involved in the case.[6]   Keller insists that he was deprived of an opportunity to challenge the factual and legal bases for the amendment.

¶25.    The State filed a motion to amend the indictment on May 6, 2008, in which the State sought to sentence Keller as a habitual offender pursuant to Mississippi Code Section 99-19-83, based on a March 1999 conviction for burglary (for which he served a seven-year sentence) and a March 1999 conviction for grand larceny (for which he served five years). The record is void of any hearing on the motion to amend the indictment. Judge Jerry O. Terry granted the motion on June 6, 2008.  There is no signed order appointing Keller counsel; however, a statement indicating that his case was assigned to the public defender's office was filed with the court on June 11, 2008. Keller was arraigned on August 18, 2008. The motion, the order granting the motion, and the amended indictment are in the record.

¶26.    The State argues that the issue is procedurally barred due to Keller's failure to challenge the indictment prior to trial.  Keller argues that he cannot be charged with failing to object to the motion and subsequent order to amend the indictment because both were "concealed" from Keller, his counsel, and Judge Clark.  Alternatively, Keller argues that his counsel was ineffective for failing to review the court file and/or failing to take action to have the amendment set aside.

> Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. This is because during direct appeals the Court is limited to the trial court record in its review of the claim, and there may be instances in which insufficient evidence exists within the record to address the claim adequately. ***Wilcher v. State***, 863 So. 2d 776, 825

---

[6]Judge Clark initially was assigned to the case. The order granting the amendment to the indictment was signed by Judge Jerry O. Terry.

(Miss. 2003). In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post-conviction relief. ***Read v. State***, 430 So. 2d 832, 837 (Miss. 1983).

***Gowdy v. State*** 56 So. 3d 540, 543 (¶ 7) (Miss. 2010) (quoting ***Archer v. State***, 986 So. 2d 951, 955 (¶ 15) (Miss. 2008)). The Court declines to grant relief on the basis of ineffective assistance of counsel, because the issue is not based on "facts fully apparent from the record." Miss. R. App. P. 22.

¶27. It is not necessary for the Court to address the issue on appeal, because, regardless of whether the indictment was amended or not, there were only two options for Keller's sentence – the death penalty or life without parole.

### *Compensation of State's Witness*

¶28. Keller argues that the Court has cautioned the bench and bar that improper compensation of witnesses resulting in prejudice to the defendant warrants reversal of a conviction. *See **Woodward v. State***, 726 So. 2d 524, 544 (¶ 89) (Miss. 1997) ("[T]his Court urges trial judges to be extremely cautious in complying with the statutes regarding payment of witness fees in the future.").

¶29. Keller asserts that Muffi, one of the State's witnesses, was reimbursed at a rate of "more than sixteen times" what Mississippi law authorizes for her travel expenses from Lee County to Harrison County for the trial, plus two hotel bills. Furthermore, Keller argues that there was no statutory authority for compensating Muffi's traveling companion, Gary Roberts (to whom the trial court authorized a check for traveling expenses and for whom the trial court paid for a room at a local hotel), and that the State misrepresented to the court that Roberts was a witness. Muffi's companion was paid $362.67 ($321.20 for 584 miles at $0.55

19

mile plus $41.47). The motion and order reference the "attached itemized expenses and charges," but the record does not contain any attachments or itemized charges. The State also filed two motions for lodging costs (two hotel rooms for Muffi and Roberts at $69.00 each). The trial court granted the lodging expense on January 12, 2010, and those bills were paid directly to the hotel. Mississippi Code Section 25-7-47, the statute authorizing expenses for witnesses, provides (in pertinent part):

> Witnesses in the county, circuit, and chancery courts shall receive one dollar and fifty cents per day and five cents for each mile going to and returning from the courthouse to their homes by the nearest route, and such tolls and ferriages as they may actually be obliged to pay; but mileage, toll, and ferriage shall be charged but once at each term of court, and a charge shall not be made for mileage except that traveled in this state.

Miss. Code Ann. § 25-7-47 (Rev. 2010).

¶30. Conversely, the State argues that the issue is procedurally barred for failure to raise it before the trial court and that Keller had notice, because the motions for expenses and orders were made part of the record. While Keller avers that he was not made aware of the payments until after he had been sentenced, the State points out that the date of the order authorizing travel expenses for Gary Roberts was the day of sentencing, October 8, 2009. Keller did not oppose the motion for travel expenses at the time nor did he raise it in his motion for new trial on October 15, 2009. Nothing indicates that Keller opposed the motion for lodging, although Keller contends that the order was obtained *ex parte* and that he had no notice of the State's motion for lodging.[7]

---

[7]Alternatively, Keller argues that counsel was ineffective in failing to recheck the court file for any filings made post-trial. As previously stated, ineffective-assistance-of-counsel claims generally are addressed in post-conviction-relief petitions because such

¶31. We agree that Keller is procedurally barred from raising the issue for the first time on appeal. In *Woodward*, 726 So. 2d at 543, the Court applied a procedural bar (although alternatively addressing it for lack of merit) where a defendant raised the issue of excessive expenses paid to witnesses for the prosecution, claiming that he did not receive notice of the State's motions for expenses and had discovered payments for these expenses only when reviewing the record for appeal. The Court found that the orders authorizing the first two payments to the State's witness were in the record prior to the defendant's resentencing trial. A third payment to the witness had been ordered after the post-trial motion in the case had been filed. *Id.* The Court found that "Woodward clearly had notice of the payment of witness fees. However, because Woodward did not timely object to the first two payments, he waived his right to object to the third payment." *Id.*

¶32. Assuming for argument's sake that Keller has not waived his right to raise the issue of the payment for lodging, given that it was made after sentencing and after the amended post-trial motion for a new trial was made, and accepting his claim that he did not have actual notice of the motion and subsequent order, we find, alternatively, the claim is without merit.

¶33. Keller argues that the State had an obligation to disclose the compensation paid to Muffi and her traveling companion pursuant to *Kyles v. Whitley*, 514 U.S. 419 (1995); *United States. v. Bagley*, 473 U.S. 667 (1985); and *Brady v. Maryland*, 373 U.S. 83 (1963). Keller argues he was prejudiced because he did not have opportunity to impeach the witness

claims rest on facts not fully apparent from the record. Miss. R. App. P. 22. The Court will not address the claim on direct appeal, but will preserve Keller's right to address it in a post-conviction-relief petition.

as to the benefit received. ***Banks v. Dretke***, 540 U.S. 668 (2004); ***Bagley***, 473 U.S. at 676; Miss. R. Evid. 616.[8]

¶34. Keller maintains that his Sixth Amendment right to confrontation was violated, because the information should have been provided at a time that permitted him to make effective use of it. ***Lawrence v. Lensing***, 42 F.3d 255, 257 (5th Cir. 1994). At the very latest, according to Keller, the disclosure should have occurred prior to cross-examination. ***Giglio v. United States***, 405 U.S. 150, 153-54 (1972); *see also* ***Meeks v. State***, 604 So. 2d 748, 755 (Miss. 1992) (stating the often-cited rule that wide-open cross-examination of any matter bearing upon the credibility of the witness is allowed, including the possible interest, bias, or prejudice of the witness).

¶35. A ***Brady*** violation occurs where the record shows the existence of evidence that 1) is favorable to the accused or impeaching of a state's witness, 2) was suppressed either willfully or inadvertently by the prosecution, and 3) is "material" to the accused's defense. ***Banks***, 540 U.S. at 691 (citing ***Bagley***, 473 U.S. 667). While Keller has a valid argument that information regarding payment to Muffi for expenses could have been used to impeach her for any potential bias, proving suppression by the State is more problematic for Keller. Given that the motion was filed post-trial and all payments were ordered post-trial, the record is silent as to whether the State had made an agreement with Muffi *before* trial for paid expenses or that Muffi expected compensation for her expenses prior to her testimony. Additionally, all motions for expenses and orders for payment were made part of the trial

---

[8]"For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible."

court's record. Lastly, Keller argues that, because Muffi was a material witness to the State's case, the materiality prong is satisfied. To satisfy the third **Brady** prong requires that there must be a "reasonable probability" that the result of the proceeding would have been different if the evidence had been disclosed. **Kyles**, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." **Id.** Stated differently, a "reasonable probability" of a different result is present where the State's evidentiary suppression "undermines confidence in the outcome of the trial." **Id.** (citing **Bagley**, 473 U.S. at 678).

¶36. Reimbursement for travel expenses and lodging for a state's witness and the person who accompanied her, particularly where the motions requesting reimbursement and orders authorizing payment appear in the record, can hardly be said to have denied Keller a fair trial or undermined confidence in the verdict and sentence, particularly considering that Muffi's testimony was supported by testimony by Teo and Montiforte. As such, the instant case is comparable to **Woodward**, 726 So. 2d at 545, wherein the Court found no error in the alleged overpayment of the State's witnesses, notwithstanding a lack of statutory authority for the payments, due to the defendant's inability to show how he had been prejudiced by the compensation to the witnesses.

¶37. Keller also argues that overpayment by the State constituted prosecutorial misconduct to such a degree that reversal is required. In support of his argument, Keller cites **Brown**, 986 So. 2d at 275, for the premise that reversal is warranted where a prosecutor fails to heed the Court's admonition regarding what is impermissible conduct. The instant case is easily

23

distinguished from **Brown** in that the prosecutor in that case made a "send a message" argument to the jury and misrepresented to the trial court that the Court had upheld similar "send a message" arguments, when, to the contrary, the Court repeatedly had admonished prosecutors for similar pleas to juries and considered it as stand-alone reversible error in some instances.  **Brown**, 986 So. 2d at 275.

II.     **Whether the trial court committed reversal error in the jury selection process.**

### Off-the-record voir dire

¶38.    These arguments by Keller are repetitive of his previously discussed assignment of error regarding the court reporter's failure to transcribe proceedings conducted at the bench. More specifically, Keller argues that he was prejudiced by his absence at the bench during the voir dire of four members of the venire.[9]  As previously discussed, the State maintains that the issue is procedurally barred for counsel's failure to object to voir dire at the bench while Keller remained at counsel table.  Alternatively, on its merits, the argument fails, because a bench conference has not been considered a critical stage of trial.  **Jordan**, 786 So. 2d at 1021-22.  Moreover, nothing in the record suggests that Keller was not present in the courtroom during voir dire.

¶39.    One of the venire members who actually served on the jury, Juror 2, was questioned at the bench during voir dire, because she identified herself as a victim of a violent crime.

_____

[9]In support of his argument that reversal of the conviction is warranted, Keller cites caselaw that holds the erroneous seating of even one juror is reversible. *See **Snyder v. Louisiana**, 552 U.S. 472 (2008); **Gray v. Mississippi**, 481 U.S. 648 (1987); **Pitchford v. State**, 45 So. 3d 216, 224 (Miss. 2010) (recognizing constitutional error as to seating or striking even a single juror).

24

The transcript reflects that "a conference was held at the bench with both parties." After voir dire, the trial judge recounted for the record that Juror 2, when questioned at the bench, indicated that she and her husband had been accused of domestic violence against each other. She said that these charges had never gone to court and that she did not think it would affect her ability to be fair in the case. Juror 2 also had heard about the case on the news but stated that it would not affect her ability to be impartial. Keller has waived the assignment of error, as his counsel did not use a strike to remove her from the venire, and both parties accepted Juror 2.

¶40.    Keller also claims error with prospective Juror 24. Juror 24 came forward at the trial court's invitation to discuss privately at the bench (with "all parties" present) his experience with violent crime, given that he had identified himself when the venire was asked about involvement with violent crime. Juror 24 was peremptorily struck by the defense after he indicated his brother had been convicted of assault. Again, given that the defense struck him, presumably because his brother had been convicted of a crime, Keller has waived the instant assignment of error.

¶41.    Keller avers that another juror, Juror M, was erroneously questioned at the bench, and thus, Keller was unable to participate along with his counsel in deciding whether to keep or strike Juror M. A bench conference revealed that Juror M's stepfather had abused his mother, but Juror M did not think the history of abuse would impact his ability to be fair. There was no objection to the bench conference, and Keller struck Juror M.

¶42.    Juror K came forward to advise the court that he had a prior conviction as a juvenile that was handled in Youth Court and that he had no other convictions. Later, he told the trial

court he could not be sequestered because he worked four nights a week and did not have a replacement. Moreover, Juror K had been assaulted by off-duty police officers who were later prosecuted but did not think the alleged assault would affect his ability to be impartial. After voir dire was concluded, the State challenged Juror K for cause, because he had sequestration issues, and defense counsel agreed to excusing Juror K.

¶43. We have recognized a procedural bar on appeal where the defense has failed timely to object to the State's peremptory challenges to venire members. *Thomas v. State*, 517 So. 2d 1285, 1286 (Miss. 1987) (citing *Irving v. State*, 498 So. 2d 305 (Miss. 1986)). "Moreover, 'a party who fails to object to the jury's composition before it is empaneled waives any right to complain thereafter.'" *Duplantis v. State*, 644 So. 2d 1235, 1245 (Miss. 1994) (quoting *Myers v. State*, 565 So. 2d 554, 557 (Miss. 1990)). The bar applies even in capital cases. *Duplantis*, 644 So. 2d at 1245 (quoting *Chase v. State*, 645 So. 2d 829, 859 (Miss. 1994)).

¶44. The issue has not been sufficiently preserved for appeal. Alternatively, Keller argues that his counsel's failure to object constituted ineffective assistance of counsel. As previously stated, any issue not clearly apparent from the record is best addressed in a post-conviction-relief petition. Miss. R. App. P. 22.

### *Voir dire and sentencing*

¶45. Keller repeats his argument that the failure to record voir dire conducted at the bench is reversible error, given that he attempted to preserve his right to a complete transcript in his pretrial motion. The State argues that Keller did not object contemporaneously to the failure

26

to record the bench conferences throughout voir dire and cannot now complain that the failure is error. For reasons previously discussed, the issue is without merit.

¶46. Keller insists that one post-hoc reconstruction of a bench conference by the trial court was inaccurate. He maintains that where the trial court has made an actual mistake in reconstructing a bench conference, the mistake results in a due-process violation that requires reversal. *See Eaves v. State*, 730 So. 2d 717, 718 (Fla. Dist. Ct. App. 1999). Keller fails to cite the portion of the record that he claims is inaccurate or incomplete. Moreover, Keller fails to cite controlling authority that reversal is necessary.

¶47. Keller further argues that the trial court improperly limited defense voir dire relating to the jurors' understanding of the sentencing process and then exacerbated the harm with off-record resolution of the defense's objections to the limitations. In general, voir dire is presumed sufficient to ensure a fair and impartial jury. To overcome the presumption, a party must present evidence indicating that the jury was not fair and was partial and must show that that prejudice resulted from the circuit court's handling of voir dire. *Ross v. State*, 954 So. 2d 968, 988 (Miss. 2007). "[V]oir dire is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion." *Foster v. State*, 639 So. 2d 1263, 1274 (Miss. 1994).

¶48. Keller argues that, in a capital case, prospective jurors must be examined not only for their biases, knowledge, or other pertinent matters but also about their ability to engage in death-penalty sentencing deliberations. *See Morgan v. Illinois*, 504 U.S. 719 (1992); *Witherspoon v. Illinois*, 391 U.S. 510 (1968). According to Keller, capital jurors are required to have two interrelated characteristics: (1) the ability to make the requisite

27

individual, reasoned, and moral response to sentencing-phase evidence, and (2) an understanding of and the ability to comply with the statutory method Mississippi has implemented for doing so. *Morgan*, 504 U.S. at 733-34. Keller argues that the trial court "thwarted all attempts by the defense to conduct voir dire necessary to 'lay bare the foundation' for any cause challenges it would have to make to jurors who are unable to do either of these two things," citing *Morgan*, 504 U.S. 733. Moreover, Keller argues that the voir dire was aimed at exploring the jurors' ability to fulfill their constitutional obligation to follow instructions regarding individual, reasoned, and moral response to the evidence in deciding what sentence that evidence permits or requires. He argues that the failure of the trial court to prevent the line of questioning by the defense was a violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. More specifically, Keller takes issue with a sustained objection by the trial court to the following line of voir dire:

> [Defense counsel]: There are three choices that you have when you go back into jury room: death, life without and we can't make up our minds. When you say we can't make up our minds the judge is required under the law to give the defendant life without.

The State objected, and the trial court held a bench conference before ultimately sustaining the objection and instructing the jurors to disregard the question. Keller asserts that the line of questioning by defense counsel was a correct statement of the law and that the instruction by the trial court to disregard it served to confuse the jury. *See* Miss. Code Ann. § 99-19-101(3) (Rev. 2007) (providing that, if a jury cannot unanimously agree as to the death sentence, then the court shall impose a sentence of life imprisonment); *see also **Sudduth v.***

28

*State*, 562 So. 2d 67, 72 (Miss. 1990) ("This Court has repeatedly condemned confusing and misleading instructions.").

¶49.    The second instance with which Keller takes issue was as follows:

> [Defense counsel]:   You will be required, and I must say this individually, each of you individually, will be required to decide whether this defendant is so far beyond redemption that he should be killed.

The State objected to the line of instruction to the jury by the defense, and the trial court sustained. The language the "defendant is so far beyond redemption that he should be killed" is an inaccurate statement of the law, and the trial court cannot be held in error for sustaining the objection.

¶50.    The line of questioning continued as follows:

> [Defense counsel]:   . . . The judge won't make that decision. No other appeal court is going to make this decision.

The above-quoted statement drew another objection, which the trial court sustained. Ultimately, the following voir dire by defense was allowed:

> [Defense counsel]:   . . . In any case, that is the real decision you will be required to make, and you must make this decision individually. It takes, and the court will instruct you, that it takes 12 of you to impose either sentence.[10]

¶51.    Moreover, the following was objected to by the State and sustained by the trial court:

---

[10]As noted by Keller in his brief-in-chief, counsel's statement constitutes an inaccurate statement of the law. Mississippi Code Sections 99-19-101(3) and 47-7-3(1)(e) provide that a life sentence without parole is imposed by either a unanimous verdict by the jury or disagreement as to any sentence at all. However, during the sentencing phase, the jury was properly instructed by the trial court.

[Defense counsel]: Do any of you believe that you must reach a verdict when you go back and decide what the sentence will be? That you must decide one way or the other. That all 12 of you must decide that way. Do any of you believe that to be true?

¶52. Following a bench conference, the trial court allowed the following from the defense:

[Defense counsel]: Ladies and gentlemen, you understand that you are not required by the law to go back into the jury room after you've reached a verdict and you're deciding on a sentence, you're back there to decide life or death, that you are not required to reach a verdict of death. Do you understand that? Does everyone understand that? That's the point that I was trying to make.

¶53. In *Foster*, 639 So. 2d at 1274, defense counsel attempted to question the venire as to whether they believed a verdict of guilty for a capital-murder charge automatically resulted in a death sentence. The trial judge denied the attempt as an incorrect statement of law and a line of questioning that had the potential to confuse the jury. *Id.* The Court found no error where a review of the entire voir dire proceeding did not indicate Foster was denied his right to question the venire on the death penalty. *Id.* Given the considerable discretion the trial judge has in voir dire, where the voir dire proceedings as a whole indicate Keller was able to inquire as to the venire's opinions on the death penalty, and the court informed the jury that it had a duty to make decisions about Keller's fate on an individual basis, and that the death penalty was not required, there is no error in the judge refusing a line of questioning (which actually reads more like jury instructions) that is a misstatement of the law or that the trial court believed would confuse jurors.

¶54. During the sentencing phase, the trial court instructed the jury as follows:

If you are unable to unanimously agree on the sentence, the Judge will sentence the Defendant to life imprisonment without parole and the form of your verdict shall be:

30

We the jury are unable to agree unanimously on punishment.

It is presumed that jurors follow the instructions of the court. *Payne v. State*, 462 So. 2d 902, 904 (Miss. 1984); *Carter v. State*, 450 So. 2d 67, 69 (Miss. 1984). Given that the jury ultimately was instructed and that Keller failed to show how he was prejudiced by the line of voir dire the trial court disallowed, the Court finds no merit in the instant assignment of error.

### *Removal of jurors qualified to serve under Witherspoon*

¶55. Keller argues that Jurors E and C were improperly eliminated based on their beliefs regarding their conscientious objections to the death penalty in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968). Keller asks that the Court reverse the conviction and sentence and remand for a new trial based on the trial court's exclusion of these jurors.

¶56. To the contrary, the State argues that Keller did not argue before the trial court that *Witherspoon* had been violated; thus, he is procedurally barred from making the argument on direct appeal. *Tate v. State*, 912 So. 2d 919, 928 (¶ 27) (Miss. 2005) ("Issues not brought before the trial court are deemed waived and may not be raised for the first time on appeal") (citing *Wilcher v. State*, 479 So. 2d 710, 712 (Miss. 1985)). Out of an abundance of caution, and because the defense objected to the removal of Jurors E and C from the venire, we will address the issue notwithstanding any procedural bar that may apply.

¶57. The Court, in *Wilcher v. State*, 863 So. 2d 776, 813-14 (¶ 116) (Miss. 2003), recognized the standards promulgated by the United States Supreme Court in both *Witherspoon* and *Wainwright*:

"[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." [*Witherspoon*, 391 U.S.] at 522, 88 S. Ct. 1770. The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 481 (1985).

Based on their responses during voir dire, it is conceivable that both Juror E's and Juror C's views on capital punishment would have prevented or substantially impaired the performance of their duties as jurors.

¶58. Juror E stated several times that he is Catholic and that the Catholic Church opposes the death penalty. When questioned by defense counsel as to whether he could impose the death penalty, Juror E responded: "[B]ased on my upbringing and based on my Catholic faith [there is a] 99.9 percent chance I don't believe that I could do it." Juror C stated multiple times that she did not think she could vote to impose the death penalty, that it would be "very, very difficult" for her to do, and that she could not think of a single circumstance in which she believed she could vote in favor of a death sentence.

¶59. The record bears out that the trial court had ample bases for excluding these venire members given their responses to questioning as to whether their personal beliefs regarding capital punishment would prevent or substantially impair them from carrying out their duties as jurors. The issue is without merit.

*Whether the trial court erred in seating Juror A.*

32

¶60. Keller avers that the trial court erred in seating Juror A (Juror 5), who disclosed to a bailiff (after he had been selected, seated, and sworn as a juror) that he had a rehearsal dinner and wedding to attend that had the potential to conflict with the jury sequestration. Juror A made the potential conflict known after having been seated and having failed to answer direct questions from the trial judge regarding whether any of the venire members had scheduling conflicts. Keller contends that the "failure of a prospective juror to make complete and honest responses to voir dire questions necessar[ily] impairs a defendant's right to a fair trial and requires reversal of his conviction if prejudice ensues from that failure." In support of his contention that his sentence should be vacated due to the juror's failure to disclose a scheduling conflict prior to being seated, Keller cites *Morgan*, 504 U.S. at 729. In *Morgan*, the United States Supreme Court stated:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.* The *Morgan* analysis cited by Keller is inapplicable to the facts presented in the instant case in that at no time did Juror A express that he could not be impartial about the imposition of the death penalty, but rather that he might have had a scheduling conflict.

¶61. Keller, however, maintains that Juror A's presence on the jury prejudiced the defense in two ways: (1) actual prejudice occurred when the jury reached a guilty verdict after only

33

thirty minutes, and (2) the process of jury selection was prejudiced, because Juror A's silence during voir dire when the venire was asked directly about conflicts prevented the defense from striking him. The Court addressed the issue in *Odom v. State*, 355 So. 2d 1381, 1383 (Miss. 1978):

> Where . . . a prospective juror in a criminal case fails to respond to a relevant, direct, and unambiguous question presented by defense counsel on voir dire, although having knowledge of the information sought to be elicited, the trial court should, upon motion for a new trial, determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond.

¶62. Even if the questions from defense counsel regarding scheduling conflicts, as propounded to the jury, were relevant to voir dire and unambiguous, and if Juror A knew at the time of his upcoming plans, Keller has failed to show that he was prejudiced. The trial judge made both parties aware that Juror A had spoken with a bailiff during a break in proceedings. Keller failed to make a contemporaneous objection to Juror A's remaining on the jury. Juror A's conflict never came into play with regard to whether he was able to serve and carry out his duties. Keller speculates that the reason the jury returned a verdict in thirty minutes was due to a hasty decision on the party of Juror A because of his scheduling conflict. The argument is not supported by the record and is based entirely on speculation.

**III.** **Whether the trial court erred in failing to suppress the final statement elicited from the defendant at Biloxi Regional Medical Center by law enforcement.**[11]

*Whether the trial court erroneously applied controlling "fruit of the poisonous tree" jurisprudence in not suppressing Keller's third statement to police.*

¶63.   After having been shot by police during pursuit of his vehicle, Keller was transported to Biloxi Regional Medical Center's emergency room shortly before midnight on June 21, 2007. While Keller received treatment for the gunshot wounds, including the insertion of a chest tube, police questioned him about his involvement in Hat's death. In total, Keller made statements on three separate occasions to police, implicating himself in the shooting death.

¶64.   The trial court found that the first interview, conducted by Investigator Craig Shows, was inadmissible due to the judge's finding that the recorded portion of the interview revealed that Keller was in a great deal of pain and distress. As stated in the trial court's order granting in part Keller's motion to suppress: "The totality of the circumstances in the Emergency Room convinces the [c]ourt that Keller was unable to have knowingly, voluntarily, and willingly waived his rights under *Miranda* at that time."[12] Likewise, the second recorded police interview, conducted by Officer Michael Brown approximately thirty

---

[11]A hearing on Keller's motion to suppress the statements he made to police at Biloxi Regional Medical Center was held on August 27, 2009, with the Honorable Roger T. Clark presiding.

[12]*See* ***Miranda v. Arizona***, 384 U.S. 436 (1966). Investigator Shows administered two separate *Miranda* warnings. Investigator Brown did not administer an additional *Miranda* warning. However, it is clear that the trial court's ruling was not based on the sufficiently of the warning given, but rather on Keller's capacity to waive his rights.

minutes after the first police interview, was suppressed due to the fact that Keller was in a great deal of pain and did not seem to be alert and/or aware of his surroundings.

¶65.   The following day, at 2:00 p.m., on June 22, 2007, Brown interviewed Keller a third time. Brown read Keller his *Miranda* warnings, and Keller responded: "I understand." The trial court found that "Keller clearly responded that he understood he was waiving his rights." The trial court made on-the-record findings that the totality of the circumstances established that Keller voluntarily and knowingly confessed to shooting and killing Hat. The trial court rejected Keller's argument that the "fruit-of-the-poisonous-tree" doctrine applied to the third statement, rendering the third statement inadmissible, because it was tainted by the suppression of the two previously coerced statements. On remand, the trial court found that the three statements given by Keller to law enforcement officials were not coerced and that, even if any of the first two statements were, the third statement was freely and voluntarily given and sufficiently removed from the first two statements to "purge the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 486 (1963).

¶66.   On appeal, Keller again argues that, because the first two confessions were obtained due to overreaching by the officers, the trial court should have applied the "fruit-of-the-poisonous-tree" doctrine and thus suppressed the third confession.[13] Conversely, the State

---

[13]In support of his argument, Keller cites the following analysis from the United States Supreme Court:

> The *Wong Sun* doctrine applies as well when the fruit of the *Fourth Amendment* violation is a confession. It is settled law that "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act

argues that Keller was not foreclosed by the prior inadmissible statements from subsequently waiving his rights and providing a confession. "[S]ince the trial court sits as the fact-finder when determining the issue of whether an accused's confession has been intelligently, knowingly and voluntarily given, we will only reverse the trial court's determination of this issue when such determination is manifestly wrong." *Richardson v. State*, 74 So. 3d 317, 322 (¶ 14) (Miss. 2011) (quoting *Glasper v. State*, 914 So. 2d 708, 716 (¶ 21) (Miss. 2005) (citing *Manix v. State*, 895 So. 2d 167, 180-81 (Miss. 2005))).

¶67.    For a statement to be admissible against an accused, the accused must knowingly and voluntarily waive his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. *Miranda v. Arizona,* 384 U.S. 436 (1966); *Saucier v. State*, 562 So. 2d 1238, 1244 (Miss. 1990); *Powell v. State*, 540 So. 2d 13, 16 (Miss. 1989). "[S]tatements taken in violation of the *Miranda* principles must not be used to prove the prosecution's case at trial." *Michigan v. Tucker*, 417 U.S. 433, 445 (1974). The trial court found, despite police having issued *Miranda* warnings on both occasions, Keller had appeared to be in extreme distress while being treated for gunshot wounds in the emergency room at the time of the first and second police interviews. Thus, the incriminating statements to police were not voluntarily and/or knowingly given. However, the trial court ruled that there was no *Miranda* violation when Brown

---

of free will to purge the primary taint.'" *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S. Ct. 2664, 2667, 73 L. Ed. 2d 314 (1982) (quoting *Brown v. Illinois*, 422 U.S. 590, 602, 95 S. Ct. 2254, 2261, 45 L. Ed. 2d 416 (1975)).

*Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (emphasis added). Notably, the analysis from *Wong Sun* addresses a confession made after an illegal arrest, not a failure to advise an accused of his Fifth and Sixth Amendment rights in violation of *Miranda*.

approached Keller the following day in the ICU, because the officer gave an adequate warning and because Keller voluntarily and knowingly waived his Fifth and Sixth Amendment rights.

¶68.   Keller claims that the trial court erred as a matter of law, because it failed to consider the totality of the circumstances surrounding the third confession by ignoring the fact that the same officer who had administered unconstitutional coercion to obtain a statement in the ER was the officer who approached Keller in the ICU.  *See Kircher v. State*, 753 So. 2d 1017, 1023-24 (¶ 28) (Miss. 1999) ("The voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances.") (citing *O'Halloran v. State*, 731 So. 2d 565, 570 (Miss.1999); *Gavin v. State*, 473 So. 2d 952, 954 (Miss.1985); *Stevens v. State*, 458 So. 2d 726, 729 (Miss. 1984)).

¶69.   In *Byrom v. State*, 863 So. 2d 836, 858 (Miss. 2003), the Court rejected the notion that an illegally obtained confession necessarily requires the exclusion of a subsequent voluntary confession.  "The remedy for coercive interrogation practices is exclusion of the statements in which the coercion was present.  It does not require the exclusion of all subsequent interrogations that are preceded by proper *Miranda* warnings and are not coercive." *Id.* at 861 (¶ 72) (citing *Oregon v. Elstad*, 470 U.S. at 316-18).  *But see Rollins v. State*, 300 So. 2d 145, 146 (Miss. 1974) (recognizing a "presumption of law that a confession obtained by the influence of a threat or a promise, once made, continues to operate unless it is shown that a subsequent confession was not made under the influence of the previous threats or promise").

¶70.   In *Byrom*, the defendant argued that she should have been advised that prior incriminating statements she made to police were inadmissible.  Her argument was that law enforcement's statements that she already had talked to the sheriff and already knew her rights

were tantamount to law enforcement exploiting the prior, illegally obtained statements to get the subsequent confession. The Court rejected that argument, finding that Byrom had failed to show "that the admitted statements were obtained by exploiting the excluded statements." *Byrom*, 863 So. 2d at 859 (¶ 62).

¶71.    Keller suggests that the United States Supreme Court in *Missouri v. Seibert*, 542 U.S. 600 (2004), rejected the reasoning relied on by the Court in *Byrom*, 863 So. 2d at 858. However, *Seibert*, 542 U.S. at 611-12, addressed a police interrogation tactic referred to as "question first, warn later" and whether that tactic made the *Miranda* warning ineffective when given after a confession was obtained. In holding that *Miranda* warnings are ineffective under a "question first, warn later" approach, the Supreme Court reasoned:

> [T]he reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.

*Id.* at 613. We are of the opinion that *Seibert* applies only to a single-interview scenario where police fail to warn, question a suspect, obtain a confession, then administer a *Miranda* warning in hopes of having the accused repeat the confession given prior to the *Miranda* warning. In other words, these are "*Miranda* warnings delivered midstream." *Id.* at 615. *Seibert* has no application to the instant facts, where police questioned Keller a third time the day after he had been transported from the ER to the ICU, police readministered a *Miranda* warning, and police

39

approached the interview anew without relying on anything revealed in the first two interrogations.

¶72. The record supports the trial court's finding that Keller intelligently, knowingly, and voluntarily confessed. Keller gave a full confession to the murder in a series of coherent, narrative responses to Investigator Brown's questions. At no time did Keller invoke his right to remain silent or ask to confer with counsel. Nothing in the record supports a theory that the statements made in Keller's two suppressed interrogations were exploited to secure a subsequent confession. "Once a determination of voluntariness is made by the trial court, the defendant bears a heavy burden in attempting to reverse the trial court's finding that the confession is admissible." *Blue v. State*, 674 So. 2d 1184, 1204 (Miss. 1996).

> ***Whether the trial court's conclusions of law in the Remand Opinion concerning coercion and its effect on Keller's third statement to police are contrary to controlling law and unsupported by the record.***

¶73. At the suppression hearing, prior to remand, the trial court found that Keller's first two confessions were taken in violation of *Miranda* but did not then address, as it should have, whether the confessions were themselves the product of coercion. *Elstad*, 470 U.S. at 304; *see also* ***Davis v. North Carolina***, 384 U.S. 737, 740 (1966) (holding that *Miranda* does not change the duty of courts to analyze whether a confession offends pre-*Miranda* standards of voluntariness). When a confession is taken in violation of *Miranda*, but does not offend due process by being otherwise coerced, no constitutional rights of the accused have been violated, and the presumption that subsequent confessions are tainted does not apply. *Elstad*, 470 U.S. at 304-06. However, if a confession is obtained through unlawful tactics or coercive circumstances, and not merely through a defective delivery of the prophylactic *Miranda*

warnings, it taints any subsequent confession that may appear facially voluntary. *Id; see* *Shelton v. State*, 699 S.W.2d 728, 733 (Ark. 1985).

¶74. A clear distinction exists between the voluntariness of a waiver of *Miranda* and the voluntariness of a confession itself under both the federal Due Process Clause and Mississippi law. The trial court correctly analyzed Keller's confessions for the purposes of *Miranda* in the suppression hearing, but it failed to analyze his confessions under a standard due process analysis. "There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of a 'guilty secret' freely given in response to an unwarned but noncoercive question . . . ." *Elstad*, 470 U.S. at 312. Mississippi has recognized long before the protections of *Miranda* the impact such coercive circumstances have on both immediate and subsequent confessions, yet the trial court failed to consider any of the Court's precedents in issuing its original order. *See, e.g., Fisher v. State*, 145 Miss. 116, 110 So. 361 (1926); *Jones v. State*, 133 Miss. 684, 98 So. 150 (1923). Because the trial court failed to step outside of *Miranda* and complete the analysis of whether the first two confessions were obtained via improper coercion and thereby tainted the third, the Court remanded the case for an evidentiary hearing on the issue.

¶75. The trial court held on remand that, while it previously had determined that the first two statements "were inadmissible because [of] Keller's physical/mental condition, it did not find then and does not find now that there was coercion by the officers." As the Court previously has written, "[d]etermining whether a confession is admissible is a finding of fact which is not disturbed 'unless the trial judge applied an incorrect legal standard, committed manifest error,

41

or the decision was contrary to the overwhelming weight of the evidence.'" *Snow v. State*, 800 So. 2d 472, 495-96 (¶ 87) (Miss. 2001) (quoting *Lee v. State*, 631 So. 2d 824, 826 (Miss. 1994)).

¶76.   "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."  *Colorado v. Connelly*, 479 U.S. 157, 169 (1986).   The Fifth Amendment is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." *Elstad*, 470 U.S. at 305.   "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Connelly*, 479 U.S. at 167.   "[A]s interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Id.* at 164 (citing *Spano v. New York*, 360 U.S. 315 (1959)).

¶77.   The trial court made numerous findings of fact concerning the coercive nature of the three statements.  First, the trial court stated that "the record . . . is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements from Keller."  The court found that, contrary to Dr. Jackson's opinion, the statements by police as to what was going to happen to Keller and when the officers could give Keller water were not coercive in nature.  Further, the court added that Keller was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit . . . ." *Connelly*, 479 U.S. at 170 (citing *Fare v. Michael C.*, 442 U.S. 707, 726-27 (1979)).  "The officers did not intimidate or threaten him in any way.  Their questioning was restrained."

42

¶78.   The trial court's findings on remand are supported by the record and do not rise to the level of being manifestly erroneous. It may be questionable that the police interrogate a suspect while he is being treated in an emergency room setting absent extraordinary circumstances; however, there is no evidence suggesting that the police officers did so to coerce Keller. Instead, testimony by the investigators reveals that they had a "limited time to find out . . . any information from Mr. Keller that we could that would assist the investigation." Additional testimony by Investigator David Perry, who was present during the first emergency room statement, demonstrates that the police officers "didn't know what was going to happen, if he was going to be in surgery, if he was going to have life-threatening injuries. So we conducted that interview [and] got the information . . . ." Further, the proper legal standard was applied to Keller's case on remand. As such, the trial court did not err in its determination that none of the three statements given by Keller was coerced.

¶79.   The analysis does not end here. We must consider Keller's third statement – the one admitted by the trial court. As the United States Supreme Court stated, the analysis rooted in *Wong Sun* "requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown v. Illinois*, 422 U.S. 590 (1975) (quoting *Wong Sun*, 371 U.S. at 486). "Demonstrating such purgation is, of course, a function of circumstantial evidence, with the burden of persuasion on the State. Relevant considerations include observance of *Miranda*, '[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'" *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (quoting *Brown*, 422 U.S. at 603-04).

43

¶80. Keller argues that the first two statements, which were deemed involuntary, tainted the third statement, thereby making it fruit of the poisonous tree. Even when those statements are suppressed, Keller argues, the circumstances surrounding them and leading into the third statement render the last statement involuntary. In its opinion on remand, the trial court noted that no subsequent statement is ever totally free from an earlier statement. Accordingly, "a later confession may always be looked upon as fruit of the first. However, we have never gone so far as to hold that making a confession under circumstances which preclude its use perpetually disables the confessor from making a usable one after those conditions have been removed." *United States v. Bayer*, 331 U.S. 532, 540-41 (1947).

¶81. The trial court found that the third statement was obtained by "means sufficiently distinguishable to be purged of the primary taint." *Hooker v. State*, 716 So. 2d 1104, 1112 (¶ 28) (Miss. 1998) (citing *Yates v. State*, 467 So. 2d 884, 887 (Miss. 1984)). The trial court noted that the third statement was taken fourteen hours after Keller's first arrival at the hospital, away from the chaos of the emergency room. Further, Keller gave no indication of the pain or distress he had exhibited in the emergency room. Additionally, the trial court found that Keller gave a detailed statement without coaxing by the officer and that the facts he related were verified by other independent evidence not obtained in either of the two previous statements.

¶82. There are simply not enough facts to show that the trial judge, taking into account the totality of the circumstances, "applied an incorrect legal standard, committed manifest error, or rendered a decision which was contrary to the overwhelming weight of the evidence" in determining that the third statement was admissible. *Glasper v. State*, 914 So. 2d 708, 716 (¶ 21) (Miss. 2005). Therefore, the issue is without merit.

***Whether Keller's invocation of his right to remain silent was violated when police resumed questioning***.

¶83.    Keller maintains that he invoked his right to silence during an interrogation while he was being treated in the emergency room; thus, according to Keller, the police disregarded his invocation of the right to silence by approaching him a third time for another interview.  The record shows a factual dispute as to whether Keller expressed that he did not wish to speak to police.  Shows testified that at no time did Keller express that he did not want to cooperate.  In fact, Shows testified that Keller had expressed that he "wanted all this to be over with."  Based on Shows's testimony, it is clear that he did not interpret "all this to be over with" to refer to the interrogation to be terminated.  Sergeant Rick Allen of the Biloxi Police Department, who was present in the emergency room during Shows's interview with Keller, corroborated Shows's testimony.  At the suppression hearing, when the interrogation tape was played for Shows on the stand, Shows testified that the garbled contents of the recording prevented him from hearing what defense counsel suggested was "I don't want to talk to you anymore."  After Shows left the emergency room, Keller reinitiated contact with police by expressing a desire to speak with Sergeant Allen about the danger faced by the officers who were en route to retrieve the murder weapon from the crack house where Keller had left it.  Brown testified that, during the course of the second interview by Brown, Keller never invoked his right to silence or to counsel but asked Brown at one point if they could talk at a later time.

¶84.    The Court has distinguished the invocation of the right to counsel versus the right to silence as follows:

> Invocation of the right to counsel is a rigid, prophylactic rule which prohibits further questioning until an attorney is made available or the defendant

45

knowingly and voluntarily waives his right. *See Edwards*, 451 U.S. 477, 101 S. Ct. 1880. On the other hand, invocation of the right to silence concerns whether an officer scrupulously honors a defendant's right to cease questioning for a reasonable time, after which questioning may resume if the defendant knowingly and voluntarily waives this right. *See Neal v. State*, 451 So. 2d 743, 755 (Miss. 1984).

*Chamberlin v. State*, 989 So. 2d 320, 334 (¶ 43) (Miss. 2008). Assuming Keller explicitly invoked his right to silence to Shows, the testimonial evidence shows that he reinitiated contact with Allen after Shows left the emergency room. Moreover, his statement that he desired to talk with Brown at a later time cannot be said to be an invocation of his right to remain silent. Even so, Brown did wait "for a reasonable time" before conducting a third interview the following day, prior to which Keller expressed an understanding that he was "knowingly and voluntarily" waiving his right to silence. *Chamberlin*, 989 So. 2d at 334 (¶ 43).

### *Whether the Miranda warning and waiver obtained prior to the third statement were insufficient and invalid.*

¶85. In the third recorded police interrogation, Investigator Brown issued the *Miranda* warning as follows:

> BROWN: I'd like to read you your rights. I know you said you would agree to talk to us, but I gotta do that anyway. You know you have the right to remain silent, anything you say . . . can and will be used against you in court or any other judicial or administrative proceedings. You have the right to speak to an attorney prior to any questions. You may have an attorney with you during questioning. If you desire an attorney and cannot afford one, one will be appointed for you free of charge. And if you decide to answer questions now, without an attorney present, you still have the right to stop the questioning at any time and request that an attorney may be made available to you. Do you understand all that?
>
> KELLER:    I understand.

Keller argues that the response "I understand" was insufficient to convey that he was asking to waive his *Miranda* rights.

46

¶86. Finally, Keller argues that he was "heavily sedated" while being treated in the ICU, and, as a result, could not have knowingly waived his *Miranda* rights. *See* **Gavin v. State** 473 So. 2d 952, 955 (Miss. 1985) (finding that defendant voluntarily waived his *Miranda* rights and noting that there was no evidence the defendant was under the influence of any sedative or medication at the time of police questioning). In support of his argument, Keller points to the trial court's findings regarding the State's failure to adduce testimony by medical personnel regarding Keller's medical condition while in the emergency room and suggests that the findings apply equally to his time in the ICU, as there was no medical testimony to establish the effects of Keller's pain medications.

¶87. Keller's medical records, indicating that he had been prescribed pain medications during the course of his treatment in the ICU, were before the trial court. To the contrary, Brown testified during the suppression hearing that Keller appeared coherent and alert when answering his questions. The record reveals that, with minimal prompting, Keller related to the officer the series of events leading up to his having entered Hat's convenience store. Subsequently, Keller confessed the following:

> KELLER: . . . Don't know why I did it, but I did it. I asked her for a pack of cigarettes. When she turned around, I pulled my gun out and when she turn back around, I told her give me all the money. She started screaming no. I just shot her . . . .

During the course of the police interview, Keller recounted having shot Hat several more times before shooting her one final time at close range in the back of the head. Keller then admitted stealing money and fleeing the scene. The trial court found as follows: "Keller's demeanor was much different than during the first two statements. He sounded alert, spoke coherently, did not

47

appear to be in pain, and responded to the questions with clear, understandable answers." There was no evidence of coercion, pressure, or promise of reward on the part of the interrogating officer. "In making its ruling on the admissibility of a statement made during custodial questioning, the trial court, of course, considers whether there is evidence to support the conclusion that, from the whole course of questioning, an express or implied waiver has been established." *Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010). Even if "I understand," is not an express waiver, the demeanor and responses of Keller throughout the interview were sufficient to convey an implied waiver and willingness to confess to police.

¶88. Additionally, despite the evidence adduced by the defense, in the form of medical records, which showed that Keller was prescribed pain medication while in ICU and that Keller had continued to test positive for cocaine, Brown's testimony was that Keller was alert and coherent. Having listened to the recording of the ICU police interview, the trial judge found Keller alert, coherent, and giving clear responses. Where the trial court has resolved the issue of admissibility of a confession against a defendant, the Court generally affirms, even when that finding is decided on conflicting evidence. *Lesley v. State*, 606 So. 2d 1084, 1091 (Miss. 1992) (citations omitted).

      **IV.**    **Whether prosecutorial misconduct and erroneous rulings by the trial court caused the jury to receive inadmissible information during the culpability phase of the trial which requires reversal of Keller's conviction of capital murder.**

           *Denial of Keller's Rule 404(b) motion to exclude prior bad acts*

¶89. Keller argues that the trial court erred in failing to grant his pretrial motion to exclude any evidence of uncharged criminal actions. Keller admitted to police during his third police

interview that he had stolen two vehicles that day, one just before the murder and one just after the murder. Those thefts were the subject of separate indictments for which he had not been tried at the time of the capital-murder trial.

¶90. Ultimately, the trial court denied the motion and held that evidence was adduced before the jury in both phases of the trial. Keller himself testified during the guilt phase of trial that he had stolen two of his stepfather's vehicles on the day of the murder. Keller argues that "proof of a crime distinct from that alleged in an indictment is not admissible against an accused." *Gray v. State*, 351 So. 2d 1342, 1345 (Miss. 1977).

¶91. The State argues that the vehicle thefts, which occurred just before and after the shooting of Hat, were all interconnected and necessary to tell the complete story of the day. Thus, the events of the day, including the auto thefts, all were part of one transaction that culminated in Hat's murder. *See* Miss. R. Evid. 404(b) cmt. ("Evidence of another crime, for instance, is admissible where the offense in the instant case and in the past offense are so inter-connected as to be considered part of the same transaction.") (citing *Neal v. State*, 451 So. 2d 743 (Miss. 1984)).

¶92. Alternatively, Keller argues that, even if evidence of the thefts was admissible under Rule 404(b), the evidence did not pass muster under Mississippi Rule of Evidence 403 in that the undue prejudice substantially outweighed any probative value of the evidence. In support of his suggested premise, Keller cites the following:

> There may not always be a necessity to tell the whole story. Cases such as this illustrate the point that the testimony of each witnesses and each item of evidence offered may or may not be relevant. Some evidence which is not necessary for the State to prove its case of capital murder . . . could be unduly prejudicial to a

defendant. Thus, all such evidence under Rule 404(b) must be filtered through Rule 403.

*Flowers v. State*, 773 So. 2d 309, 321-22 (¶ 36) (Miss. 2000). Ultimately, Keller argues that evidence that Keller had stolen two trucks on the day of the shooting should have been excluded because it was unnecessary to prove the elements of capital murder and it was unduly prejudicial to the defense.

¶93. The Court has held that otherwise inadmissible evidence of prior bad acts is admissible in instances where the prior bad acts are "integrally related in time, place and fact with the" crime for which the defendant is being tried. *Wheeler v. State*, 536 So. 2d 1347, 1352 (Miss. 1988). In *Wheeler*, the Court reiterated a concern for "the State's legitimate interest in telling a rational and coherent story of what happened . . . ." *Id.* (citing *Neal*, 451 So. 2d at 759). In the instant case, Keller relayed to the police an account of the day's events in which he admitted stealing a truck and possessing a stolen firearm just prior to the robbery and the shooting death of Hat. Keller then fled the scene on foot before stealing another vehicle and smoking crack for hours before he was apprehended by police while driving the stolen vehicle. Keller's confession depicts a series of events just before and after the capital murder of Hat. We find that the vehicle thefts met the exception recognized by the Court in *Wheeler* and *Neal.*

> ***Whether the trial court erred in allowing the jury to read the transcript of Keller's police interview.***

¶94. Keller argues that the use of the transcript prejudicially impaired the jury's attention to the actual evidence, such that reversal is required. Keller asserts that if any jurors read the transcript and did not follow the audio, then they would have missed Keller's remorseful and serious demeanor during the police interview.

50

¶95. At trial, Keller objected to the jurors having been provided the transcript of the audio recording of the police interrogation, although Keller conceded that the transcript was accurate. The trial court instructed the jury that the transcript was not evidence, that the audio recording was evidence. They were instructed that if there happened to be a discrepancy between the tape and transcript they were to "go with the tape."

¶96. The State argues that Keller is precluded from making the argument because he fails to cite any authority that supports his contention. *See Simmons v. State*, 805 So. 2d 452, 487 (¶ 90) (Miss. 2001) ("Failure to cite relevant authority obviates the appellate court's obligation to review such issues.").

¶97. Notwithstanding any procedural bar that may apply, the Court previously has rejected the argument that it is impermissible for jurors to be assisted by transcripts to read while a recording (that has been admitted into evidence) is played.

> [A]ppellant . . . questions the propriety of introducing into evidence a tape recording, along with a transcript of same, of an out-of-court statement made by the appellant with reference to the shooting. Prior to the jury's hearing the tape the court offered a cautionary instruction advising the jurors that the tape was the primary evidence of what was or was not recorded and that the transcript was being furnished for their convenience in following the tape. This procedure was approved in **United States v. Onori**, 535 F.2d 938 (5th Cir. 1976). We find no error in this procedure.

*Dye v. State*, 498 So. 2d 343, 344 (Miss. 1986). The jurors in the instant case were aptly instructed that they were to follow along with the audio recording and that the recording was the primary evidence. The argument is without merit.

> **Whether photographs and the pathologist's diagram were erroneously admitted.**

51

¶98. The State, over Keller's objection, was allowed to introduce photos into evidence of Hat postmortem. Some of the photographs were taken at the Food Mart, and some were taken during the autopsy. Additionally, the forensic pathologist, Dr. Paul McGarry, used a diagram as a visual aid during his testimony. Keller argues that the trial court erred in admitting the photographs of the victim taken at the scene and during the course of the autopsy, along with the diagram used by the pathologist, because the photographs and diagram were cumulative of other testimonial evidence, were in no way indispensable to the State's case, and served only to inflame the jury due to their gruesome nature. Moreover, Keller avers that, in the instant case, the killing was neither contradicted nor denied and the identity of the decedent was established. Keller cites the following: "Photographs of a victim should not ordinarily be admitted into evidence where the killing is neither contradicted nor denied, and the *corpus delicti* and the identity of the deceased have been established." **Hewlett v. State**, 607 So. 2d 1097, 1102 (Miss. 1992).

¶99. According to Keller, because the probative value of the evidence was outweighed by the gruesome and overly prejudicial nature of the photographs, the evidence was inadmissible under Rule 403 of the Mississippi Rules of Evidence. Keller cites **Hickson v. State**, 472 So. 2d 379, 385 (Miss. 1985), a case inapplicable to the instant case in that it condemns the viewing by the jury of actual anatomical parts of a decedent, not photographs. Keller also argues that autopsy photographs are "almost *per se* inadmissible." **Hurns v. State**, 616 So. 2d 313, 319 (Miss. 1993) ("Few autopsy photographs will meet the criteria of containing more probative value, as compared to being unfairly prejudicial or inflammatory, or overly gruesome."). The photographs marked S-8, S-10, and S-11 were taken during the autopsy.

¶100. Ultimately, Keller contends that reversal is necessary, because the diagram and photographs injected arbitrary and prejudicial elements into the decisions the jury made in the instant case and denied him a fundamentally fair trial in violation of the Fourteenth and Eighth Amendments to the United States Constitution and Article 3, Sections 14, 26, and 28 of the State Constitution.

¶101. Conversely, the State cites precedent that emphasizes the amount of discretion placed in the hands of the trial court in the admission of photos at trial. Regarding the admissibility of photographs, the Court has held:

> In *Westbrook v. State*, 658 So. 2d 847, 849 (Miss. 1995), this Court found that photographs of a victim have evidentiary value when they aid in describing the circumstances of the killing, *Williams v. State*, 354 So. 2d 266 (Miss. 1978); describe the location of the body and cause of death, *Ashley v. State*, 423 So. 2d 1311 (Miss. 1982); or supplement or clarify witness testimony, *Hughes v. State*, 401 So. 2d 1100 (Miss. 1981).

*Le v. State*, 913 So. 2d 913, 955 (¶ 158) (Miss. 2005) (quoting *Stevenson v. State*, 733 So. 2d 177, 180 (¶ 8) (Miss. 1998)). As to the amount of discretion afforded the trial court upon review of the admission of photographs, the Court has stated:

> The admissibility of photographs rests within the sound discretion of the trial court. *Jackson v. State*, 672 So. 2d 468, 485 (Miss. 1996); *Griffin v. State*, 557 So. 2d 542, 549 (Miss. 1990); *Mackbee v. State*, 575 So. 2d 16, 31 (Miss.1990); *Boyd v. State*, 523 So. 2d 1037, 1039 (Miss. 1988). Moreover, the decision of the trial judge will be upheld unless there has been an abuse of discretion. *Westbrook*, 658 So. 2d at 849. The "discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Hart v. State*, 637 So. 2d 1329, 1335 (Miss. 1994) (quoting *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987)).

*Gray*, 728 So. 2d at 57-58 (¶ 92) (quoting *Brown v. State*, 690 So. 2d 276, 289 (Miss. 1996)).

¶102. In the instant case, State's Exhibit 6 was introduced during the testimony of Teo to identify the gunshot victim as Hat. State's Exhibits 6 and 7 were used during Montiforte's testimony to aid in his description of the circumstances of the killing, as well as the location and position of the body upon the officer's arrival on the scene. The remainder of the photographs, along with the diagram, were used by Dr. McGarry in establishing the cause of death. Accordingly, we find that, at all times, the photographs were used for the purposes approved by the Court in *Le*, 913 So. 2d at 955 (¶ 158).

> ***Whether improper victim impact evidence was adduced during the culpability phase.***

¶103. Keller contends that evidence was adduced during the guilt phase that should have been admissible, if at all, only in the sentencing phase of the proceedings. First, he contends that the State adduced irrelevant, unnecessary pain and suffering testimony from the pathologist, namely that the State elicited testimony regarding Hat's pain and suffering. According to Keller, the error was compounded when the prosecutor drew upon the testimony to argue in closing that Hat was killed for $255, that she was not "necessarily killed," but "brutally murdered." The proper procedure, according to Keller, would have been for the State to recall Dr. McGarry during the sentencing phase. *See, e.g., **Evans v. State**,* 725 So. 2d 613, 698 (¶ 397) (Miss. 1997) (noting that Dr. McGarry was recalled by the State to testify regarding pain and suffering of victim as evidence of State's contention that the crime was especially, heinous, atrocious, and cruel). The only objection from the defense concerned the fourth gunshot wound. The basis of that objection was that it called for a speculative response that Dr. McGarry could not possibly know. The question, as rephrased, drew no objection, nor did the line of argument

54

made by the prosecutor in closing. Keller has waived his right to raise the argument for failure to object contemporaneously at trial. *See* ***Thorson v. State***, 895 So. 2d 85, 112 (¶ 64) (Miss. 2004) ("This Court has repeatedly held that '[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case.'") (quoting ***Foster v. State***, 639 So. 2d 1263, 1270 (Miss. 1994)).

¶104. Keller argues that testimony from Teo constituted victim-impact testimony, which was improperly adduced in the guilt phase of the trial. When asked by the State to identify the victim for the jury, Teo responded:

> She's Ms. Hat Nguyen. She a loving, careful, you know, she's a real nice, sweet mother. She take care of her four kids. They lost their house right after–during the storm. They lost their house so they moved into that convenient store, and they lived inside there. She take care of two of her young kids. Well she got four kids total that live in that shop with no shower or nothing. You know, they cook and clean in there . . . . I mean, they were a nice family. They try to do what they got to do to survive through their life. . . .

Keller objected to Teo's statement on the basis of relevance, which the trial court sustained. No motion to strike the testimony was ever made. Thus, we find that the issue was not preserved for appeal, because the objection was not premised on any argument that the testimony was improper victim-impact testimony. *See* ***Scott v. State***, 796 So. 2d 959, 964 (¶ 16) (Miss. 2001) (applying the rule that "objections must be made with specificity to preserve for appeal") (citing ***Oates v. State***, 421 So. 2d 1025, 1030 (Miss. 1982); ***Heard v. State***, 59 Miss. 545 (1882)). Teo also testified that, when he arrived at the scene of the murder, he was afraid to walk into the rear of the store for fear that the criminal might still have been present, so he failed to check on the youngest children. The statement did not draw objection from the

defense. The State argues that the line of testimony also is procedurally barred for failure to object. *See **Thorson***, 895 So. 2d at 112 (¶ 64).

¶105. Keller also takes issue with the following from the State's closing:

> This is the guilt or innocence phase of the trial. In order for you to actually consider a sentence, that would be in the next phase of the trial, but in order for that to happen you must return a verdict of guilty against Mr. Keller for his crime against Mrs. Nguyen.

Finally, Keller takes issue with what he argues is an improper reference to the jury's opportunity to sentence Keller if it returned a guilty verdict: "Your two choices at this point are to return a verdict of guilty of capital murder or not guilty. Anything else we'll take up through another phase, a separate hearing that is required." Keller argues that the statement constituted improper "in the box" argument condemned by the Court in ***Stringer v. State***, 500 So. 2d 928, 938-39 (Miss. 1986). At no time did the defense object to the State's closing arguments. Keller has waived his right to raise the issue, because he raised it for the first time on appeal. *See **Thorson***, 895 So. 2d at 112 (¶ 64).

¶106. Alternatively, on the merits, the line of closing argument did not rise to the level of the prosecutorial misconduct in ***Stringer***, 500 So. 2d at 938-39, which the Court reversed due to the following misconduct by the prosecution:

> It is an improper influence to put the jury in a "box" by voir dire tactics which extract a promise, prior to trial, to ignore evidence favorable to the defendant. This promise or pledge prevents the jurors from considering all factors relative to the verdict. The jurors are then called upon during closing argument to fulfill that promise, and the effect -- whether calculated or not -- is to shame or coerce the jury into rejecting factors which would tend to mitigate against the death penalty. We charge the jury in a capital murder case to narrow and distinguish the cases deserving of the death penalty from those which do not warrant such an extreme punishment.

Nothing about the mere mention of a bifurcated process or that a guilty verdict must be returned in order for there to be a sentencing phase suggests prosecutorial misconduct in the instant case.

### *Whether the State's expert Dr. McGarry testified outside the scope of his expertise.*

¶107. Keller asserts that Dr. McGarry testified outside his field of expertise and based on insufficient facts or data to support his conclusions in violation of Rule 702 of the Mississippi Rules of Evidence,[14] which in turn caused the State to premise its theory of the case on his speculative opinions, resulting in prejudice to Keller's defense such that reversal of his conviction is warranted. *See Edmonds v. State*, 955 So. 2d 787, 792 (¶ 8) (Miss. 2007) (reversing defendant's conviction based on lack of empirical support for pathologist's two-shooter theory). More specifically, Keller maintains that the testimony adduced on the effects of the wounds, the similarity in caliber of the bullets recovered, and the order in which the shots were fired was based merely on speculation.

¶108. The State submits that Keller has waived the argument for failure to object at trial. Keller made no *Daubert* [15] challenge at trial and did not object to the trial court qualifying Dr. McGarry as an expert in forensic pathology. Keller did not object to testimony as to the effects

---

[14]Mississippi Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

[15]*See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Mississippi Transp. Comm'n v. McLemore*, 863 So. 2d 31, 35 (Miss. 2003).

of each gunshot on Hat, with the exception of what was identified as wound "D." The exchange was as follows:

> [State]: . . . Doctor, in your expert opinion would the defendant have to shoot Ms. Nguyen again after he shoots her with wound D in order for him to leave the store?
>
> [Defense counsel]: We're going to object to that. No way possibly [sic] Dr. McGarry could know that.
>
> [The Court]: Sustained as to the way the question was asked. I will allow you to rephrase it.
>
> [State]: Doctor, after wound D . . . would Ms. Nguyen be in any position to put up a struggle or to put up a fight in order to keep the defendant in the store?
>
> [Dr. McGarry]: She would be able to move, she would be able to struggle, she would be very much alive, but she would be brain damaged. She would not be in her usual state of logical or rational thinking. I think she would be seriously stunned. She would probably be on the floor.

Neither the question as rephrased, nor the response from Dr. McGarry, drew an objection from the defense.

¶109. There was no objection to the line of questioning and testimony regarding the fact that the bullets recovered were of the same caliber. The defense failed to object to testimony regarding the positioning of the victim when shots were being fired. For all the aforementioned reasons, the assignment of error has not been preserved for appeal. "The rule that failure to make a contemporaneous objection waives the issue on appeal generally applies to death penalty cases." *Ross v. State*, 954 So. 2d 968, 987 (¶ 27) (Miss. 2007) (citing *Williams v. State*, 684 So. 2d 1179, 1189 (Miss. 1996)).

¶110. Alternatively, Keller argues that alleged prosecutorial misconduct in the form of arguments in the guilt phase based on Dr. McGarry's testimony concerning the order in which the shots had been fired and the posture of the decedent at the time, constitutes plain error and/or ineffective assistance of his counsel for failure to make such an objection. Keller fails to cite any authority in support of the argument. The Court has no obligation to address issues in which there is a failure to cite relevant authority. *Simmons v. State*, 805 So. 2d 452, 487 (Miss. 2001); *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998).

### Whether the State's opening statement in reference to Keller's multiple statements to police violated the suppression order.

¶111. Keller claims it was reversible error for the prosecutor to indicate in his opening statement that the jury was going to hear testimony that Keller had provided statements to law enforcement officers. Keller avers that, where a statement has been suppressed as involuntary, no reference may be made to that statement or those statements before the jury. *See New Jersey v. Portash*, 440 U.S. 450, 459 (1979) ("[A]ny criminal trial use against a defendant of his involuntary statement is a denial of due process of law") (citing *Mincey v. Arizona*, 437 U.S. 385, 398 (1978)). *Portash* is distinguishable from the instant case in that it did not address any reference of any kind to such statements, but rather, held that grand-jury testimony under a grant of immunity cannot be used to impeach a defendant at a later criminal trial. *Id.* at 459-60.

¶112. Keller concedes that defense counsel made no objection to the opening statement. But he contends, however, that the Court may review the issue for plain error or as the product of ineffective assistance of counsel. *See Walker v. State*, 913 So. 2d 198, 216 (¶ 45) (Miss. 2005) (stating that plain-error review is implicated when an error occurs at trial which affects

59

substantial rights and results in "a manifest miscarriage of justice") (quoting *Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989)).

¶113. Arguments made by counsel during opening statements do not constitute evidence. *Goff*, 14 So. 3d at 652 (¶ 108) (citing *Henton v. State*, 752 So. 2d 406, 409 (Miss. 1999) (closing arguments are not evidence); *Crenshaw v. State*, 513 So. 2d 898, 900 (Miss. 1987) (opening statements are not evidence)). The jury was instructed by the trial court as follows: "Arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark." The reference to statements in the prosecutor's opening does not rise to the level of plain error. Keller's claim of ineffective assistance of counsel, if any, is best reserved for post-conviction proceedings. *See* Miss. R. App. P. 22.

> **V. Whether the culpability phase verdict was also constitutionally flawed by improper instructions and premature and insufficient deliberation by the jury and thus, must be revised.**

### *Jury instructions on noncapital murder and manslaughter*

¶114. Keller requested and was denied a jury instructions on deliberate-design murder and manslaughter. He contends that the denial warrants reversal. To the contrary, the State contends that there was no evidentiary basis for any of the instructions, given that Keller had confessed to murder while in the commission of a robbery.

¶115. The Court has held:

> [A] lesser-included offense instruction should be granted unless the trial judge, and ultimately this Court, can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn

60

in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense (conversely, not guilty of at least one essential element of the principal charge).

*Edwards v. State*, 737 So. 2d 275, 310-11 (¶ 114) (Miss. 1999) (quoting *Conner v. State*, 632 So. 2d 1239, 1254 (Miss. 1993); *McGowan v. State*, 541 So. 2d 1027, 1028 (Miss. 1989)).

¶116. Capital murder is defined, in pertinent part, as:

The killing of a human being without the authority of law by any means or in any manner . . . .

When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies[.]

Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2006).  Murder, in pertinent part, is defined as follows:

The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

When done with deliberate design to effect the death of the person killed, or of any human being. . . .

Miss. Code Ann. § 97-3-19(1)(a) (Rev 2006). Manslaughter (heat of passion) is defined as:

The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, . . . .

Miss. Code Ann. § 97-3-35 (Rev. 2006).[16]

¶117. At trial, Keller did not take the stand, nor did he produce any witnesses.  There were no eyewitnesses to the murder.  Based on Keller's own testimony in the sentencing phase, he now

---

[16]Keller's proposed manslaughter instruction closely tracks the statutory elements for heat-of-passion manslaughter; thus, for the purpose of analysis, only the statutory elements of heat-of-passion manslaughter are listed.

argues on appeal that he was too intoxicated and sleep-deprived from having smoked crack cocaine to have formed the necessary intent to commit robbery. Conversely, the evidence, namely Keller's police interrogation, showed that Keller had decided upon arriving at the Food Mart to rob Hat. Moreover, Keller told the investigator that he demanded money from Hat at gunpoint and then began firing the gun at her. After she handed over the money, Keller told police that he fired at her again until finally, seeing her struggling on the floor, he put the gun to her head and fired a final shot before taking off with the money. Thus, the evidence of his intent to rob Hat and the actual robbing of Hat, as contained in his taped confession, went undisputed. Moreover, consistent with Keller's own statement, the forensic pathologist testified that the fatal bullet wound was a contact shot to Nguyen's head.

¶118. The instant case is factually similar to that of ***Davis v. State***, 684 So. 2d 643, 657 (Miss. 1996), where the Court found no error in the trial court's refusal to provide the jury with a lesser-included-offense instruction. In ***Davis***, the defendant was charged with capital murder while engaged in the commission of a robbery. ***Id.*** The question before the Court was whether the evidence supported a theory that the robbery did not occur. In holding that there was no evidence to support the defense's theory that the robbery had not occurred, the Court found the following facts significant:

> There were no witnesses to this murder. The main evidence is the confession of Davis as testified to by [law enforcement]. Davis did not take the stand. Through his confession, Davis admitted that he had gone to [the victim's] trailer for the purpose of getting money to buy drugs, and when [she] refused to give him the money, he killed her. Davis further confessed that he took the money and went to Jackson County to buy drugs . . . . In this instance, there is no denial in any form or fashion of the robbery, and there is no suggestion by Davis that it was anything other than capital murder. In this record, the evidence only supports capital murder.

*Id.* Therefore, the trial court was said not to have erred in declining to grant the lesser-included jury instruction, given that "[a] reasonable jury could not have found Davis not guilty on the charge of capital murder." *Id.*

¶119. There was no evidentiary basis for a theory that the robbery did not occur. Therefore, the trial court did not err in refusing the instructions.

> *Whether evidence was adduced in the culpability phase that should have been adduced only in the guilt phase.*

¶120. Keller argues that the record supports a finding that the jury was more interested in speedily arriving at a guilty verdict than in following proper procedures. *See Holland v. State*, 587 So. 2d 848, 874 (Miss. 1991) (remanding for resentencing where jury had engaged in preliminary deliberations regarding punishment before conclusion of the evidence). Keller again argues that Juror A's wedding plans caused the jury to render a verdict too hastily. As previously discussed, Keller failed to object to Juror A remaining on the jury after learning that the juror was fearful the trial would thwart his weekend plans. Keller also points to the fact that a password for a computer needed to play exhibits was not sought until the sentencing phase as evidence that the jurors did not take the time in their deliberations even to view and/or listen to the exhibits. However, the jury already would have seen these exhibits, given that they were published during trial. There is no evidence in the record to support the theory, so Keller's argument is mere speculation.

> **VI.    Whether the trial court erroneously permitted the State to present improper matters to the jury during the penalty phase proceedings and precluded Keller from responding to the State's evidence at that phase.**

¶121. Keller argues that the State was permitted to adduce evidence of nonstatutory aggravating circumstances and to argue these circumstances to the jury. Moreover, he contends that he was not permitted to introduce evidence that would have refuted some of these allegedly improper inferences that the State was attempting to allow the jury to draw. Keller avers that, due to the statutory violations and violation of the due-process clauses of the federal and state constitutions, a reversal of his sentence is required. *See **Brown v. Sanders***, 546 U.S. 212, 220-21 (2006) ("If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal.").

### *Evidence of prior felony convictions*

¶122. Following Keller's capital-murder conviction, the State, in the penalty phase, sought to establish the following aggravating circumstances:

1.     Whether the defendant was previously convicted of a felony involving the use of threat of violence to the person.

2.     Whether the capital offense was committed while the defendant was engaged in the commission of, or attempt to commit a robbery.

3.     Whether the capital offense was committed for the purpose of avoiding or preventing a lawful arrest.

4.     Whether the capital offense was especially heinous, atrocious, or cruel.

Miss. Code Ann. § 99-19-101(5)(b), (d), (e), (g) (Rev. 2007).

¶123. In support of the first aggravating circumstance, the State, by and through the circuit clerk, had State's Exhibits S-21 and S-22 admitted into evidence, which were (respectively) the indictment and sentencing order for Keller's conviction of armed bank robbery from December

2007. The indictment for the bank robbery charged Keller as a habitual offender pursuant to Mississippi Code Section 99-19-101(5)(b) and also included information concerning four prior felony convictions for crimes that were not "prior violent felonies." Keller's pretrial motion to exclude prior convictions had been granted by the trial court. While there was an objection to treating the bank-robbery conviction as a violent conviction under Section 99-19-101(5)(b), there was no specific objection to the other convictions being admitted into evidence.

¶124. The prosecutor asked the circuit clerk to read the portion of the indictment that charged Keller with armed robbery. It was on cross-examination that defense counsel asked the clerk to define habitual-offender status. The clerk first stated that she was not really sure what habitual-offender status meant and then responded that she thought she had "better not comment on it."

¶125. During closing arguments, the prosecutor argued the following:

> [Keller] hasn't learned his lesson . . . . The crimes that are in the sentence order show[] that Mr. Keller, *as pointed out by counsel opposite*, has other felony convictions. The armed robbery conviction was his fifth felony conviction, his fifth. Yesterday you handed down number six. Six felony convictions, and is that a man who deserves to live the rest of his life in prison? That's a man that deserves the ultimate sentence of the death penalty.

(Emphasis added.)

¶126. The State argues that the issue is procedurally barred for failure to make a contemporaneously specific objection to the admission of an unredacted indictment and sentencing order. Notwithstanding the procedural bar, the State argues that the armed robbery was the only crime the State had asked about, and it was in the form of Keller's counsel asking the witness what "habitual-offender status meant." Moreover, the State cites *Jackson v. State*,

65

684 So. 2d 1213, 1236 (Miss. 1996), stating that a certified copy of the judgment alone is sufficient evidence of a prior violent crime.[17]

¶127. The Court has recognized a procedural bar for failure to object to argument made by opposing counsel:

> [I]t is the duty of a trial counsel, if he deems opposing counsel overstepping the wide range of authorized argument, to promptly make objections and insist upon a ruling by the trial court. The trial judge first determines if the objection should be sustained or overruled. If the argument is improper, and the objection is sustained, it is the further duty of trial counsel to move for a mistrial. The circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment.

*Flowers v. State*, 842 So. 2d 531, 550-51 (¶ 52) (Miss. 2003) (applying plain-error review only to defendant's allegations that prosecutor impeached witnesses without a factual basis and argued facts in closing that were not in the record) (citations omitted). *Flowers* is distinguishable from the instant case in that facts argued in the prosecutor's closing argument had been admitted into the record without a specific objection from the defense as to the unredacted form of State's Exhibits 21 and 22 and/or the inclusion of previous nonviolent felonies.

¶128. Keller claims that his counsel was ineffective for failure to object. As previously stated, a claim of ineffective assistance of counsel is best reserved for subsequent post-conviction-relief proceedings.

### Victim-impact testimony

---

[17]The State makes no counterargument regarding Keller's alleged prosecutorial misconduct of commenting on the nonviolent felonies in closing arguments.

¶129. Keller argues that the State elicited improper victim-impact testimony from Hat's son, David, who testified that his younger brother had been sleeping in a back room of the store at the time of the murder. Keller finds the following statement particularly egregious: "[T]hank goodness he didn't hear anything, you know, because what would be his fate if he did hear something and he did come out." Keller maintains that the testimony is irrelevant, because it did not relate to any of the aggravating factors and was impermissible based on its use to incite the jury in violation of *Payne v. Tennessee*, 501 U.S. 808 (1991). *See Berry v. State*, 703 So. 2d 269, 275-76 (¶ 7) (Miss. 1997) (victim-impact testimony is admissible "if it is necessary to develop the case, and if it is relevant to any of the aggravating circumstances").

¶130. The State argues that the assignment of error is barred from consideration for failure to object contemporaneously. The Court has applied a procedural bar in a capital-murder case in which victim-impact testimony deemed inadmissible by the defense did not elicit a contemporaneous objection from defense counsel at trial. *Havard v. State*, 928 So. 2d 771, 793 (¶ 39) (Miss. 2006) ("Because the trial judge cannot be faulted for not ruling on an objection which was not made, and because this claim is also waived due to failure to object, this issue is without merit."). Accordingly, the issue is barred from the Court's review.

¶131. Alternatively, the testimony was permissible under the Court's precedent on victim-impact statements. "Victim impact statements are those which describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant." *Edwards v. State*, 737 So. 2d 275, 291 (¶ 21) (Miss. 1999) (quoting *Wells v. State*, 698 So. 2d 497, 512 (Miss. 1997)). The testimony describes the emotional effect of the crime on the victim's son and his opinion of the crime.

***Whether the trial court erroneously limited Keller's ability to present mitigating evidence.***

¶132.  Keller maintains that he was precluded from presenting mitigating evidence to the jury during the redirect examinations of his witness Deputy Deborah Whittle of the Harrison County Sheriff's Office and that the jury should have been permitted to "consider[] . . . evidence [that] the sentencer could reasonably find . . . warrants a sentence less than death." ***McKoy v. North Carolina***, 494 U.S. 433, 441 (1990).  One form of mitigation evidence is evidence that the defendant does not pose a danger or likelihood of violence in a prison setting should he be incarcerated for life without parole if the death penalty is not imposed.  ***Skipper v. South Carolina***, 476 U.S. 1 (1987).

¶133.  In an attempt to adduce mitigation evidence under ***Skipper***, Keller called Whittle, the officer in charge of the Offender Services Program at the Harrison County Adult Detention Center.  On direct, it was revealed that, during the two years Keller had been at the detention center, he had two minor rule violations – one for failure to wake up for a morning head count and the other for being in a forbidden area of the jail. Whittle testified that she had no personal knowledge of Keller as an inmate nor did she have any knowledge of his attitude or demeanor. Deputy Whittle's cross-examination (in pertinent part) was as follows:

> State: "[Y]ou don't really even know Jason Keller?"
>
> Whittle: "Not really."
>
> State: But you know that while at the Harrison County jail he has broken the rules?"
>
> Whittle: "Yes, sir."

68

On redirect, defense counsel asked Whittle, "Would you consider Jason a good inmate?" The State objected, and the trial court sustained.

¶134. Keller contends that the trial court's ruling requires reversal, given that he was prevented from rehabilitating his witness and presenting mitigating evidence. Conversely, the State argues that the trial court aptly ruled that the question was outside of the scope of preceding cross-examination. Alternatively, the State maintains the error, if any, was harmless error given the "multitude" of mitigating witnesses whom Keller presented.

¶135. In addition to Whittle, Sergeant Melinda Hester testified regarding Keller's generally good behavior while incarcerated under her supervision at the jail (i.e., got along well with others, kept peacefully to himself), as well as to his participation in a life-skills program for which she had recommended him. Moreover, Keller himself took the stand to testify in mitigation, as did his father, brother, and a psychologist, Dr. Beverly Smallwood.

¶136. We agree with Keller that the trial court erred in sustaining the State's objection. However, Whittle's testimony, when read in its entirety, reveals that she already had testified that she had no personal knowledge of Keller and that her only personal knowledge of him was that he had received two minor disciplinary actions. Moreover, other testimony adduced during the sentencing hearing was aimed at proving to the jury that Keller was an inmate who did not pose a threat of violence in a prison setting, by and through Hester. For all these reasons, the error was relatively inconsequential.

**VII.     Whether the trial court erred in the instructions to the jury at the sentencing phase and reversal is required as a consequence.**

¶137. The Court reviews the giving and/or refusal of jury instructions for abuse of discretion. *Chamberlin*, 989 So. 2d at 341-42 (¶ 80) (citing *Goodin v. State*, 787 So. 2d 639, 657 (Miss. 2001)).

### *Whether the jury considered aggravating factors not supported by law or facts.*

¶138. The jury unanimously found the following aggravating circumstances: the defendant previously had been convicted of a felony involving the threat of violence to the person; the capital offense was committed in the commission of a robbery; and the capital offense was committed to avoid or prevent a lawful arrest.

¶139. Keller contends that it was error to use his December 2007 conviction of armed bank robbery as the basis for instructing the jury that it could consider that "[t]he defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person." Miss. Code Ann. § 99-19-101(5)(b) (Rev. 2007). Keller urges the Court to overturn *Jones v. State*, 381 So. 2d 983 (Miss. 1980), and find that, in order to qualify under Section 99-19-101(5)(b) as a previous felony involving the use or threat of violence, the conviction must exist at the time of the commission of the capital offense. In *Jones*, the Court held:

> We conclude the legislature intended to relate the word "previously" to the time of trial, so that a conviction between the time the capital offense was committed and the time of trial for it may be admitted into evidence as an aggravating circumstance. We think this, because a wide leeway is permitted the appellant to offer mitigating circumstances in avoidance of the death sentence, while an extremely limited type of behavior may be offered by the state in seeking capital punishment. In our opinion, the legislature undoubtedly intended a weighing of both at the time of sentencing so the past behavioral patterns likely to affect the defendant's future behavior might be evaluated by the jury in deciding whether the defendant will live or die. We think there is no more justification for terminating consideration of the defendant's criminal behavior at the time of the

70

offense than there is for terminating consideration of favorable behavior at that time. All go to the question of whether the most severe punishment will serve a legitimate social purpose untainted by vindictiveness.

*Id.* at 994.

¶140. Keller argues that *Jones* should be overturned, because the Court's interpretation of "previously" in the *Jones* case is contrary to legislative intent, given that the other subsections denote behavior or conduct already in existence at the time of the commission of the capital murder. In support of his argument, he cites the following canon of statutory construction:

> In considering a statute passed by the legislature, . . . the first question a court should decide is whether the statute is ambiguous. If it is not ambiguous, the court should simply apply the statute according to its plain meaning and should not use principles of statutory construction. Whether the statute is ambiguous, or not, the ultimate goal of this Court in interpreting a statute is to discern and give effect to the legislative intent.

*Evans v. State*, 725 So. 2d 613, 658-59 (¶ 170) (Miss. 1997) (citing *City of Natchez, Miss. v. Sullivan*, 612 So. 2d 1087, 1089 (Miss. 1992)) (internal citations omitted).

¶141. The Court addressed and rejected an identical argument to that of Keller's, in *Wells v. State*, 698 So. 2d 497, 511 (Miss. 1997):

> We have repeatedly held that convictions subsequent to the crime for which a person is being sentenced may be used as proof of aggravating circumstances. *Taylor v. State*, 672 So. 2d 1246, 1275 (Miss. 1996), *cert. denied*, 519 U.S. 994, 117 S. Ct. 486, 136 L. Ed. 2d 379 (1996); *Turner v. State*, 573 So. 2d 657, 670 (Miss. 1990), *cert. denied*, 500 U.S. 910, 111 S. Ct. 1695, 114 L. Ed. 2d 89 (1991); *Leatherwood v. State*, 435 So. 2d 645, 651-52 (Miss. 1983), *cert. denied*, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984); *Jones v. State*, 381 So. 2d 983, 994 (Miss.), *cert. denied*, 449 U.S. 1003, 101 S. Ct. 543, 66 L. Ed. 2d 300 (1980); *Reddix v. State*, 381 So. 2d 999, 1009-10 (Miss. 1980), *cert. denied*, 449 U.S. 986, 101 S. Ct. 408, 66 L. Ed. 2d 251 (1980).

¶142. Additionally, Keller submits that instructing the jury, which already had been instructed on Section 99-19-101(5)(h), whether the capital offense was "especially heinous, atrocious or

cruel," was error because the evidence adduced by the State in the sentencing phase did not meet the minimum evidentiary threshold for presentation to the jury. The trial court based the grant of an instruction regarding Section 99-19-101(5)(h) on the testimony from Dr. McGarry, Keller's own statement to police, and Keller's testimony during the sentencing phase. The jury, however, failed to find unanimously that it was an aggravating circumstance. Because the jury found in Keller's favor as to the aggravating circumstance and ultimately found the State had failed to prove beyond a reasonable doubt that the crime was "especially heinous, atrocious or cruel," it is unnecessary to reach the issue. *See* ***Ladner v. State***, 584 So. 2d 743, 763 (Miss. 1991) (finding no error on the part of the trial court despite defendant's contention that the lower court erred in giving the "especially heinous, atrocious or cruel" instruction because the "jury did not base its imposition of the death penalty on this factor").

¶143. Finally, Keller argues that no evidence supported the instruction that the jury could find as an aggravating circumstance, pursuant to Section 99-19-101(e), that the capital offense was committed "for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." The trial judge granted the instruction on the basis that Dr. McGarry's testimony, along with Keller's statement to police (both adduced during the guilt phase of the trial), was sufficient evidentiary support for giving the instruction.

> [T]his Court has held that "[i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider this aggravating circumstance."

***Gillett v. State***, 56 So. 3d 469, 505-06 (¶ 105) (Miss. 2010) (quoting ***Leatherwood v. State***, 435 So. 2d 645, 651 (Miss. 1983)).

72

¶144. Substantial evidence supported instructing the jury on the aggravating circumstance. Keller told police that he had robbed Hat at gunpoint and that she had given him the money, yet he had continued shooting her. Finally, seeing her on the floor and incapacitated, but still alive, Keller had put the gun in close range to Hat's head and had fired the fatal shot. Although he denied having killed her to evade arrest during the sentencing phase, there was sufficient circumstantial evidence "from which it [could] be reasonably inferred that a substantial reason for the killing was to conceal" Keller's identity in order to "avoid apprehension and eventual arrest by authorities" to submit the question to the jury. *Gillett*, 56 So. 3d at 505-06 (¶ 105).

### *Keller's refused sentencing-phase jury instructions*

¶145. Keller avers that the trial court erred in refusing the following proposed instructions from the defense: D SP-2, D SP-6, D SP-7, and D SP-8.

¶146. Keller maintains that the denial of the defense's D SP-2, D SP-6, and D SP-7 instructions constituted a due-process violation in that the jurors were never instructed that a presumption of life existed, thus leaving them to conclude that the burden of proof rested on Keller at sentencing.

¶147. D SP-2 provided, in pertinent part:[18]

> The Court instructs the jury that before the Defendant can be sentenced to death by lethal injection, the aggravating circumstances must be proven to you beyond a reasonable doubt. *It must also be proven to you beyond a reasonable doubt that the mitigating circumstances do not outweigh the aggravating circumstances.*

---

[18]The State makes the argument that Keller waived the argument because the defense conceded to the State's objection to the language "by lethal injection." However, the concession did not constitute a withdrawal of the instruction *in toto*.

Finally, it must also be proven to you beyond a reasonable doubt that death by lethal injection is the appropriate punishment for the Defendant.

If upon review of the evidence any one of you has any reasonable doubt as to any of these matters, the jury must inform the Court, in writing that you are unable to agree unanimously on punishment.

(Emphasis added.)  A similar instruction was rejected in ***Thorson***, 895 So. 2d at 111 (¶ 59)

(quoting ***Edwards v. State***, 737 So. 2d 275, 314 (¶ 130) (Miss. 1999)):

Thorson argues that the jury must be instructed that they must find "beyond a reasonable doubt that the mitigating circumstances do not outweigh the aggravating circumstances."  This statement is contrary to statute and case law.  Miss. Code Ann. § 99-19-101(2)(c) & (3)(c) require that the jury find that mitigating circumstances outweigh the aggravating circumstances. This Court has held that "beyond a reasonable doubt" is not the burden on the weighing process.

The majority rule of this Court is that the jurors are required to find the existence of each aggravating circumstance beyond a reasonable doubt, but the jury is not required to find that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating circumstances following the statute.

Accordingly, the trial court did not abuse its discretion in refusing D-SP 2 in the instant case.

¶148.  D-SP 6 provided:

Each individual juror must decide for themselves whether the death penalty or life imprisonment without parole or probation is an appropriate punishment for the defendant.  Even if mitigating circumstances do not outweigh aggravating circumstances, the law permits you, the jury to impose a sentence of life imprisonment without the possibility of parole.

Only if you, the jurors, unanimously agree beyond a reasonable doubt that death is the appropriate punishment may you impose a sentence of death.

You should indicate your findings in the jury verdict form which you will have with you in the jury deliberation room.

The trial court rejected the instruction on the basis that it was covered by C-10 and the other instructions.  Instruction C-10 (amended as C-10B) and C-11 (instructing the jury that the verdict

74

represents the judgment of each juror) cover the above defense instruction. Accordingly, there was no error on the part of the trial court in refusing an unnecessary, cumulative instruction.

¶149. Keller further argues that SP-7 should have been granted, because Keller had a right to inform the jury that it could refuse to impose the death penalty even if the State had proved everything it was required to prove, and even if mitigation was nonexistent or did not outweigh the aggravating circumstances. According to Keller, the trial court, in rejecting D SP-7, ran afoul of what he argues is a mercy instruction required by *Kansas v. Marsh*, 548 U.S. 163 (2006).

¶150. D SP-7 read as follows:

> The Court instructs the jury that decision to afford an individual Defendant mercy and thereby sentence him to life imprisonment without parole would not violate the law of this State or your oath as jurors. Even if there are no mitigating circumstances in this case which are worthy of your consideration, then nevertheless, you may still sentence the Defendant to life imprisonment without parole.

Keller's argument that a mercy instruction is required was rejected outright by the Court in *Chamberlin v. State*, 989 So. 2d 320, 342 -43 (Miss. 2008). In *Chamberlin*, 989 So. 2d at 342 (¶ 82), the Court found: "*Marsh* does not speak to or even consider the issue of whether a mercy instruction is required. Rather, the *Marsh* Court held that 'the States enjoy a constitutionally permissible range of discretion in imposing the death penalty.'" (quoting *Marsh*, 548 U.S. at 175) (citation omitted). *Chamberlin* interpreted *Marsh* as leaving to the States "'to determine the manner in which a jury may consider mitigating evidence,' i.e., whether the evidence should be viewed through the lens of mercy." *Chamberlin*, 989 So. 2d at 342 (¶ 82) (quoting *Marsh*, 548 U.S. at 171). Moreover, *Chamberlin* reiterated:

75

This Court has repeatedly held that "capital defendants are not entitled to a mercy instruction." *Jordan v. State*, 728 So. 2d 1088, 1099 (Miss. 1998) (citing *Underwood v. State*, 708 So. 2d 18, 37 (Miss. 1998); *Hansen v. State*, 592 So. 2d 114, 150 (Miss. 1991); *Williams v. State*, 544 So. 2d 782, 788 (Miss. 1987); *Lester v. State*, 692 So. 2d 755, 798 (Miss. 1997); *Jackson v. State*, 684 So. 2d 1213, 1239 (Miss. 1996); *Carr v. State*, 655 So. 2d 824, 850 (Miss. 1995); *Foster v. State*, 639 So. 2d 1263, 1299-1301 (Miss. 1994); *Jenkins v. State*, 607 So. 2d 1171, 1181 (Miss. 1992); *Nixon v. State*, 533 So. 2d 1078, 1100 (Miss. 1987)).

*Id.* at 342 (¶ 83) (quoting *Howell v. State*, 860 So. 2d 704, 759 (¶ 197) (Miss. 2003)).

¶151. Keller argues that SP-8 was improperly refused because it left the jury to speculate what life "without parole" might mean, and, thus, be less willing to decide on life without parole and more likely to decide on death. D SP-8 provided:

> If you, the jury, choose to sentence the Defendant to life imprisonment without parole, the Defendant shall never be eligible for parole. Further, his life sentence without the possibility of parole shall not be reduced or suspended.

The Court, in *Rubenstein v. State*, 941 So. 2d 735, 793 (¶ 267) (Miss. 2006), found reversible error where the trial court had failed "to include the statutorily required sentencing option of life without the possibility of parole." It did not, however, go so far as to hold that "life without the possibility of parole" must be defined for jurors. Furthermore, the Court in *Pitchford v. State*, 45 So. 3d 216, 256 (¶ 175) (Miss. 2010),[19] rejected an argument identical to that of Keller, that

---

[19]The jury instruction in *Pitchford*, 45 So. 3d at 255 (¶ 169), was nearly identical to D S-8 from the instant case:

> If you the Jury chooses [sic] to sentence Mr. Pitchford to life imprisonment without the possibility of parole, Mr. Pitchford will never be eligible for parole. Further, his life sentence without possibility of probation or parole cannot be reduced or suspended.

because the defense instruction that defined life without parole was not given, then jurors were be left to speculate as to whether he actually would spend the remainder of his natural life in prison. The Court in *Pitchford* held that the trial court had not erred in refusing the defense's instruction, because it had properly instructed the jury that the defendant could be sentenced to "life imprisonment without parole." *Id.*

¶152. In the instant case, the trial court in C 10-B instructed the jurors that if twelve of them found that a sentence of life imprisonment without parole should be imposed, then that sentence "shall be" the verdict. Moreover, the jury was instructed that, should it be unable to agree unanimously on the sentence, then the judge would sentence the defendant to life imprisonment without parole. The jury was properly instructed on life imprisonment without parole; therefore, the trial court did not abuse its discretion in refusing D S-8.

### VIII. Whether the penalty phase was further rendered fundamentally unfair by the failure of the trial court to insure a constitutionally sufficient process.

#### *Off-record matters in the sentencing phase*

¶153. Keller again argues that the failure to record all proceedings during recesses and at the bench on seven occasions during the penalty phase warrants reversal.

¶154. As previously discussed in Keller's first assignment of error, Keller is procedurally barred from raising the alleged assignment of error.

#### *Whether the trial court erred in the handling of jury notes.*

¶155. Keller argues that the trial court erred in handling the off-record receipt of three jury notes, warranting reversal. Prior to the conclusion of testimony in the penalty phase, a note was received by the judge from an individual juror who asked whether each juror would be asked

individually to give his or her verdict of life in prison or death. Keller suggests that the note indicates the jurors were improperly conferring prior to the conclusion of the penalty phase. As a result, according to Keller, the trial court was obligated to heed the warning of the Court in *Holland v. State*, 587 So. 2d 848, 873 (Miss. 1991), and should have queried each individual juror as to his or her ability to be impartial. Because the trial court failed to do so, Keller argues that reversal of his sentence is warranted.

¶156. Upon receipt of the note, counsel for both parties and the trial judge conferred on record regarding the contents of the note and expressed each side's position on how best to address it. Counsel for the State suggested that the court's response to the question should be that individual jurors might be polled at the end of the guilt phase. Defense counsel had no objection to the State's suggestion. Defense counsel did not raise the issue in the Amended Motion for New Trial. The issue is procedurally barred for failure to object contemporaneously or raise the issue post-trial.

¶157. The trial judge received two other notes from the jury after it had retired to deliberate. The first requested eleven copies of the jury instructions, and the second requested the password to the computer or for someone to turn on the computer for the jury. Keller suggests that the fact that the trial judge reconstructed for the record that the parties were consulted and had no objection to these requests, rather than the consultation between the parties itself being recorded verbatim, "undermines the confidence in the fundamental fairness of the trial and warrants reversal" in the instant case.

¶158. Notwithstanding any procedural bar that might apply, the State argues that the note received from the jury in the instant case is easily distinguished from that in the *Holland* case.

78

We agree that the note in the instant case did not indicate that the jury had deliberated prior to the close of evidence during the sentencing phase, as was the case in *Holland*.

¶159. In *Holland*, 587 So. 2d at 872, upon conclusion of the guilt phase, the jury was excused so the judge and the attorneys could discuss preliminary matters before the beginning of the sentencing phase. A note was received from the jury: "We, the jury, sentence Gerald James Holland to death." *Id.* Holland moved for a mistrial. The judge denied the motion and instructed the jury that the sentencing phase was about to begin, during which testimony would be adduced, and that the jurors were to refrain from any further deliberations. *Id.* After the conclusion of the sentencing phase, the jury returned a sentence of death. *Id.* The Court held that the judge's instruction was insufficient to insure that Holland's right to a fair hearing was not prejudiced and remanded the case for resentencing. *Id.* at 874.

¶160. In the instant case, the question received prior to the conclusion of the sentencing phase was whether each juror would have to state his or her verdict of life or death. The question does not rise to the level of impropriety in *Holland*, where clearly the jury had deliberated prior to the start of the sentencing phase. Moreover, the note did not suggest that even one juror had made a determination as to the proper sentence, but, rather, questioned whether each juror would be polled.

¶161. The fact that the bench conference was not recorded to reflect that two other requests from the jury were received, namely for copies of jury instructions and a password for the computer, and that both parties agreed to the fulfillment of those requests in some way undermines the jury's verdict, is an untenable argument.

79

**IX.** **Whether the death sentence in the case must be vacated because it was imposed in violation of the Constitution of the United States.**

*Failure to include aggravating circumstances in the indictment*

¶162. Keller points to the fact that the indictment did not include the statutory aggravating circumstances in Section 99-19-101(5) and the requisite *mens rea* elements found in Section 99-19-101(7) and argues the omissions rendered the indictment unconstitutional, given that, under the Due Process Clause of the Fifth Amendment, the notice and jury trial guarantees of the Sixth Amendment, and the corresponding provision of the Mississippi Constitution, any fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.[20] Keller urges the Court to overrule precedent that has held otherwise. *See* ***Williams v. State***, 445 So. 2d 798, 804-05 (Miss. 1984):

> ("We believe that the fact that our capital murder statute lists and defines to some degree the possible aggravating circumstances surely refutes the appellant's contention that he had inadequate notice. Anytime an individual is charged with murder, he is put on notice that the death penalty may result. And, our death penalty statute clearly states the only aggravating circumstances which may be relied upon by the prosecution in seeking the ultimate punishment. In our opinion, Williams received adequate notice.")

¶163. Keller avers that the current controlling precedent of the Court, that indictments need not include the Section 99-19-101(5) aggravating circumstances, nor the *mens rea* elements under

---

[20]Keller cites ***Apprendi v. New Jersey***, 530 U.S. 466, 476-82 (2000), in support of his suggested premise. Keller also cites the following from ***Ring v. Arizona***: "The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the fact-finding necessary to put him to death. We hold that the Sixth Amendment applies to both." ***Ring v. Arizona***, 536 U.S. 584, 609 (2002). *See* Miss. Code Ann. §§ 99-19101(5), 99-19-101(7) (Rev. 2007).

Section 99-19-101(7), is impermissible under *Kansas v. Marsh*, 548 U.S. 163 (2006), a case in which, according to Keller, the United States Supreme Court found unconstitutional a capital-sentencing scheme indistinguishable from that of Mississippi.

### *Scienter provisions of the Mississippi capital-sentencing statute*

¶164. Keller submits that the statute under which he was sentenced also is unconstitutional under *Enmund v. Florida*, 458 U.S. 782, 798 (1982), and *Tison v. Arizona*, 481 U.S. (1987), both of which Keller asserts held that, in order to be sentenced to death, a defendant must have actually killed, attempted to kill, or intended to kill. Keller argues that Section 99-19-101(7) has added a fourth *mens rea* requirement that is unconstitutional, namely that capital punishment is permissible where a defendant "contemplated that lethal force would be employed." *See* Miss. Code Ann. § 99-19-101(7) (Rev. 2007). While acknowledging that the "jury did not rely on this basis in sentencing Keller to death," Keller avers that the jury still was instructed to consider this element, and the incorrect statement of law is error.

¶165. Given that the jury did not find that Keller "contemplated lethal force would be employed," we find that there is no need to address the issue. *See Estate of Smiley*, 530 So. 2d 18, 22 (Miss. 1988) ("Courts do not touch the constitutionality of a statute when it is unnecessary to do so under the particular facts of the case.") (citing *W. Line Consol. Sch. Dist. v. Greenville Mun. Separate Sch. Dist.*, 433 So. 2d 954, 957-58 (Miss. 1983)).

### *Whether duplicative use of robbery as both an element of the crime and a statutory aggravating circumstance is unconstitutional.*

¶166. Keller urges the Court to reexamine the issue and overturn current precedent that allows for an element of capital murder to be used also as an aggravating circumstance.

81

¶167. Recently, the Court, in ***Gillett***, 56 So. 3d at 510 (¶ 119), held that the "alleged felony underlying the capital-murder conviction may properly be used as an aggravator."

> [E]vidence of the underlying crime can properly be used both to elevate the crime to capital murder and as an aggravating circumstance. *See **Bennett***, 933 So. 2d at 954; ***Goodin v. State***, 787 So. 2d 639, 654 (Miss. 2001); ***Smith***, 729 So. 2d at 1223; ***Bell v. State***, 725 So. 2d 836, 859 (Miss. 1998); ***Crawford v. State***, 716 So. 2d 1028, 1049-50 (Miss.1998). Furthermore, the United States Supreme Court has held that there is no constitutional error in using the underlying felony as the aggravator. ***Lowenfield v. Phelps***, 484 U.S. 231, 233, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). The Supreme Court stated in ***Tuilaepa v. California***, 512 U.S. 967, 972, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994), that "[t]he aggravating circumstances may be contained in the definition of the crime or in a separate sentencing factor (or in both)."

***Gillett***, 56 So. 3d at 510 (¶ 119) (quoting ***Ross v. State***, 954 So. 2d 968, 1014 (¶ 120) (Miss. 2007)). We decline to overrule current precedent.

### *Baze v. Rees*

¶168. Keller argues that Mississippi's method of capital punishment, lethal injection, should be examined as to whether it comports with the safeguards of the Eighth Amendment, as recognized in ***Baze v. Rees***, 553 U.S. 35 (2008). In support of the argument, Keller asks the Court to consider an affidavit in a federal case suggesting that Mississippi's lethal injection procedure may not meet these factual criteria. The Court does not consider evidence outside the record. ***Tanner v. State***, 764 So. 2d 385, 402 (¶ 47) (Miss. 2000).

¶169. Keller asks that the Court either reverse his death sentence or order that a hearing be conducted on the lethal injection issue in the trial court before proceeding with the appeal. As argued by the State, Keller failed to raise a ***Baze v. Rees*** argument before the trial court. He is now barred from asserting it for the first time on appeal. *See **Chamberlin***, 55 So. 3d at 1056 (¶

82

34) (applying procedural bar for failure to make any arguments before the trial court regarding method of execution).

¶170.   Notwithstanding the procedural bar, the Court has held that Mississippi's lethal injection protocol is substantially similar to Kentucky's protocol, which was examined and approved by the United States Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008).  *Chamberlin*, 55 So. 3d at 1056-57 (¶ 35) (quoting *Bennett v. State*, 990 So. 2d 155, 161 (¶ 23) (Miss. 2008)).

> ***Whether Mississippi's capital-sentencing statute is unconstitutional for additional reasons.***

¶171. Keller further argues that the Mississippi capital-murder statutory scheme is unconstitutional on its face and/or as applied by the Court for failure to provide a meaningful appellate review in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and corresponding sections of the Mississippi Constitution.  Keller avers that the Court has not undertaken to apply Section 99-19-105(3)(c),[21] in such a way as to ensure that the death penalty has not been imposed in an arbitrary and capricious manner.  He has failed to cite any authority to support a finding that the Court has permitted an arbitrary and capricious application of the statute.  "Failure to cite relevant authority obviates the appellate court's obligation to review such issues."  *Byrom v. State*, 863 So. 2d 836, 863 (¶ 84) (Miss. 2003) (quoting *Simmons v. State*, 805 So. 2d 452, 487 (¶ 90) (Miss. 2001) (citing *Williams v. State*, 708 So. 2d 1358, 1362-63 (Miss. 1998))).

---

[21]Section 99-19-105(3)(c) provides that the Court shall determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant[.]"  Miss. Code Ann. § 99-19-105(3)(c) (Rev. 2007).

83

¶172. Keller asserts that Mississippi's death-penalty statutory scheme is unconstitutional due to its discriminatory effect on males, poor persons, and defendants who have killed females, in violation of the Fourteenth Amendment and corresponding sections of the state constitution. However, Keller has failed to establish an equal-protection violation.

> [A] defendant who alleges an equal protection violation has the burden of proving "the existence of purposeful discrimination." **Whitus v. Georgia**, 385 U.S. 545, 550, 87 S. Ct. 643, 646, 17 L. Ed. 2d 599 (1967). A corollary to this principle is that a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on him. **Wayte v. United States**, 470 U.S. 598, 608, 105 S. Ct. 1524, 1531, 84 L. Ed. 2d 547 (1985).

**McCleskey v. Kemp**, 481 U.S. 279, 292 (1987).

¶173. Keller contends that the aggravating circumstance found in Section 99-19-101(5)(h), "especially heinous, atrocious, or cruel," is overly broad and vague. *See* Miss. Code Ann. § 99-19-101 (5)(h) (Rev. 2007). As discussed previously, the jury failed to find that the State had met its burden of proving the aggravating circumstance beyond a reasonable doubt; accordingly, the Court need not reach the issue. *See **Estate of Smiley***, 530 So. 2d at 22 (Miss. 1988) (holding that courts do not decide the constitutionality of statutes when it has no application to the facts of a particular case) (citation omitted).

¶174. Additionally, Keller maintains that the death-penalty statutes violate the Sixth, Eighth, and Fourteenth Amendments in not allowing the death penalty in cases of simple murder, irrespective of how atrocious or premeditated the crime and no matter what the circumstances. Keller cites no controlling authority that has interpreted a capital sentencing scheme as unconstitutional under the aforementioned amendments for failure to include simple murder as

a crime punishable by death. "Failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Byrom v. State*, 863 So. 2d at 863 (¶ 84) (citations omitted).

¶175. Finally, Keller asserts that the state's death penalty violates the Sixth, Eighth, and Fourteenth Amendments by failing to provide a meaningful review in that the jury is not required to state in writing what is or was considered in mitigation, thus precluding an appellate court from making the required statutory and constitutional review of the jury's decision. The issue was disposed of in *Coleman v. State*, 378 So. 2d 640, 649 (Miss. 1979), in which in the Court held that Mississippi juries are not statutorily or constitutionally required to list mitigating circumstances.

> "This Court has never read Miss. Code Ann. §§ 99-19-101, et seq., as requiring an express written list of all the mitigating circumstances which members of the jury may find extant." [*Conner v. State*, 632 So. 2d 1239, 1277 (Miss. 1993), *overruled on other grounds by Weatherspoon v. State*, 732 So. 2d 158 (Miss. 1999)]. The Court there reasoned that the law does not require a consensus among the jury members regarding mitigating factors. Thus, "listing the jury's findings on such factors would often prove impracticable." *Id.* at 1278. Indeed, to do so may be said to undesirably limit the jury's ability to give the defendant the benefit of all of those factors.

*Bell v. State*, 725 So. 2d 836, 859 (¶ 79) (Miss. 1998). Thus, the precedent is aimed at giving the defendant the benefit of a lack of any requirement that jurors come to a consensus.

¶176. The argument has been rejected squarely by the Court, and no intervening, controlling federal precedent necessitates overturning the Court's precedent on the issue.

> **X.** **Whether the death sentence in the instant matter is constitutionally and statutorily disproportionate.**

¶177. In reviewing a sentence of death, the Court is guided by Mississippi Code Section 99-19-105(3), which provides:

With regard to the sentence, the court shall determine:

(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c) *Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant*; and

(d) Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

Miss. Code Ann. § 99-19-105-(3) (Rev. 2007) (emphasis added). Additionally, in terms of the

Court's options as to the disposition of a sentence of death, Section 99-19-105(5) provides:

*The court shall include in its decision a reference to those similar cases which it took into consideration.* In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:

(a) Affirm the sentence of death;

(b) Reweigh the remaining aggravating circumstances against the mitigating circumstances should one or more of the aggravating circumstances be found to be invalid, and (i) affirm the sentence of death or (ii) hold the error in the sentence phase harmless error and affirm the sentence of death or (iii) remand the case for a new sentencing hearing; or

(c) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life.

Miss. Code Ann. § 99-19-105-(5) (Rev. 2007) (emphasis added).

¶178. Keller correctly states that, in order for a sentence of death to be affirmed, the Court must

conclude "after a review of the cases coming before this Court, and comparing them to the

present case, [that] the punishment of death is not too great when the aggravating and mitigating

circumstances are weighed against each other." ***Nixon v. State***, 533 So. 2d 1078, 1102 (Miss.

1987). Keller argues that the crime committed was not one in that "narrow category of the most

serious crimes" that the Eighth Amendment contemplates punishing with the ultimate penalty,

nor is he someone whose "extreme culpability" makes him "the most deserving of execution."

***Roper v. Simmons***, 543 U.S. 551, 568 (2005).

¶179. As pointed out by the State, the Court, in similar capital-murder cases in which robbery

was the underlying felony, has established that a sentence of death is not disproportionate. *See*

***Goff***, 14 So. 3d at 670 (¶ 207) (recognizing that "[t]his Court has upheld the death penalty in

cases involving capital murders during the commission of a robbery"); ***Doss v. State***, 709 So.

2d 369, 400 (¶ 135) (Miss. 1996) (upholding sentence of death where defendant was convicted

of capital murder in the commission of a robbery for shooting death of store clerk); ***Davis v.***

***State***, 660 So. 2d 1228, 1261 (Miss. 1995) (upholding sentence of death in capital murder in the

commission of a robbery); ***Stringer v. State***, 454 So. 2d 468, 479 (Miss. 1984) (affirming

sentence of death for capital murder in the commission of a robbery even though defendant was

not the shooter). The issue is without merit.

**XI.    Whether the cumulative effect of the errors in the trial court mandates**
**reversal of either the verdict of guilt or the sentence of death.**

¶180. Keller argues that the cumulative effect of errors on the part of the trial court requires

reversal of the jury's verdict and/or the death sentence.

> This Court may reverse a conviction and/or sentence based upon the cumulative
> effect of errors that do not independently require a reversal. ***Jenkins v. State***, 607
> So. 2d 1171, 1183-84 (Miss. 1992); ***Hansen v. State***, 592 So. 2d 114, 153 (Miss.
> 1991). "It is true that in capital cases, although no error, standing alone, requires
> reversal, the aggregate effect of various errors may create an atmosphere of bias,
> passion and prejudice that they effectively deny the defendant a fundamentally fair

87

trial." ***Conner v. State***, 632 So. 2d 1239, 1278 (Miss. 1993) (citing ***Woodward v. State***, 533 So. 2d 418, 432 (Miss. 1988)).

***Manning v. State***, 884 So. 2d 717, 730 (¶ 44) (Miss. 2004).

¶181. Having found only one harmless error among Keller's assigned errors, the Court finds no cumulative effect of error in the instant case. The issue is without merit.

> **XII.    Except as raised to preserve substantive errors discussed in arguments I through XI, issues relating to ineffective assistance of trial counsel are not fully apparent from the record, and the right to raise such issues is reserved**.

¶182. As previously discussed regarding Keller's sub-issue three under Issue I, ineffective assistance of counsel is not ordinarily ripe for review on direct appeal.

> Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings. This is because during direct appeals the Court is limited to the trial court record in its review of the claim, and there may be instances in which insufficient evidence exists within the record to address the claim adequately. ***Wilcher v. State***, 863 So. 2d 776, 825 (Miss. 2003). In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post-conviction relief. ***Read v. State***, 430 So. 2d 832, 837 (Miss. 1983).

***Gowdy v. State***, 56 So. 3d 540, 543 (¶ 7) (Miss. 2010) (quoting ***Archer v. State***, 986 So. 2d 951, 955 (¶ 15) (Miss. 2008)). The Court finds that all claims of ineffective assistance of counsel as they relate to the issues presented should be reserved for Keller's subsequent post-conviction-relief petition, as they relate to matters not "based on facts fully apparent from the record." Miss. R. App. P. 22.

¶183. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER AND PIERCE, JJ., CONCUR.   KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**KITCHENS, JUSTICE, DISSENTING:**

¶184. I dissent. The State had its opportunity, before the trial, to try to prove beyond a reasonable doubt that Jason Keller's first two statements to police were not the products of coercion. The trial court determined that the first two statements were inadmissible because of their having been obtained in violation of *Miranda*.[22] It did not reach a determination of whether the statements were products of actual official coercion and thus in violation of Keller's due process rights. On the record that was before us, this Court could have, and should have, in the usual course of the direct appeal, determined whether Keller's confession was voluntary as understood by our courts. However, in a complete departure from regular appellate sense and procedure, the majority decided that it could not make the decision itself, and gave the State a chance to shore up its position, with a helpfully instructive order which made it unlikely that the prosecution's deficiencies would not be corrected. I would not consider any of the new evidence adduced at the remand hearing. I would find that the third confession was impermissibly tainted by the first two statements, and that it was inadmissible because it was not the product of an explicit waiver of *Miranda* rights.

I.     The "do-over."

¶185. I objected to the order granting the State a second chance to prove that Keller's first two statements, given soon after he had been shot and while doctors and nurses operated on him in order to save his life, for the same reasons that I dissent today: this Court authorized an augmentation of the record and allowed the State to put on additional proof that it had failed to

---

[22]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

produce before trial at the first suppression hearing. After the first suppression hearing was completed, it was a done deal. The record was complete on appeal, and was so certified by the circuit clerk. It was this Court's job to rule on the record as presented. Instead, we remanded for a highly unusual hearing which occurred *after* the prosecution knew what was of particular concern to this Court.

¶186. The United States Supreme Court has stated clearly that an independent review of the voluntariness of a confession must be conducted by an appellate court. "It is our duty in this case, however, as in *all of our prior cases dealing with the question whether a confession was involuntarily given*, to examine the entire record and make an *independent* determination of the ultimate issue of voluntariness." *Davis v. North Carolina*, 384 U.S. 737, 741-42, 86 S. Ct. 1761, 1764, 16 L. Ed. 2d 895 (1966) (emphasis added). "[W]e cannot escape the demands of judging or of making the difficult appraisals inherent in determining whether constitutional rights have been violated." *Haynes v. Washington*, 373 U.S. 503, 515, 83 S. Ct. 1336, 1344, 10 L. Ed. 2d 513 (1963). "[T]he emphasis upon the great weight to be given confessions make[s] all the more important the kind of 'independent examination' of petitioners' claims which, in any event, *we are bound to make*." *Ashcraft v. Tennessee*, 322 U.S. 143, 147-48, 64 S. Ct. 921, 923, 88 L. Ed. 1192 (1944) (emphasis added). This Court itself has recognized that it has the authority to review the record and make its own determination based upon the totality of the circumstances when a trial judge fails to make the necessary specific findings that we require.

> "There will be no doubt times when such cursory handling of the question of voluntariness will place us in an awkward position." . . . But, when the trial judge fails to make specific findings and only makes general findings thereby allowing admissibility of evidence, this Court's scope of review is considerably

broader particularly when the trial judge's findings on the precise points at issue on appeal are not clearly inferable from the findings made.

*McCarty v. State*, 554 So. 2d 909, 912 (Miss. 1989) (quoting *Gavin v. State*, 473 So. 2d 952, 955 (Miss. 1985)).

¶187. This Court passed the buck when it allowed the trial court to determine questions of constitutionality that could and should have been decided upon regular appellate review. Not surprisingly, the State improved its position on remand, when it was allowed to adduce *new evidence* regarding the voluntariness of the statements. That new evidence should not have been admitted, and it should not be considered by this Court on appeal. It is hard to imagine this Court's ever being disposed to afford a similar opportunity to an accused.

## II. Keller's third statement was impermissibly tainted by his first two, and should not have been admitted.

¶188. The trial court found that "the record . . . is devoid of any suggestion that police *resorted* to physical or psychological pressure to elicit the statements from Keller." (Emphasis added.) The statements by police that they were unsure about what would happen to Keller or when he could have water were not found to be coercive. While the police may not have resorted to physical or psychological pressure, I fail to see how it can be disputed that they took full advantage of the existing extreme conditions in which they found Keller. He had been shot in the chest. At one point a lung collapsed and it became medically necessary surgically to insert a tube into him while he was conscious. Keller's agony-filled groans of pain can be heard clearly in the recording of his statement.[23] The man had a life-threatening wound, was in extreme pain,

---

[23]Interestingly, Keller's treating physician, Dr. Bredemeier, testified that Keller was alert and aware during the procedure. Keller even signed his admission form to the hospital.

91

drugged up, and was being told by officers that he already had told someone else that he had killed the victim, and that he needed to tell the truth before the officers could help him. The officers had no need to "resort" to coercion; the environment of drug-addled, near-death, pain-filled police questioning was coercive enough.

¶189. I would find that the coercive nature of the questioning environment rendered Keller's statements involuntary. I further would find that his subsequent third statement was impermissibly tainted by the first two involuntary statements, as it merely was a continuation of the earlier interviews. At the *first* suppression hearing, Officer Brown testified that he went back to interview Keller the third time "to see if he still wanted to cooperate." This was a continuation of the interview process. Further, while obtaining the third statement, Brown continually referenced statements that Keller had made the night before. Keller's third statement, while taken fourteen hours after his arrival at the emergency room, was taken only eleven hours after he was removed from the emergency department to the intensive care unit ("ICU"). At 8:45 a.m., less than six hours before Keller's third statement, he was given a dose of morphine. He also tested positive for the presence of cocaine.

¶190. The third statement is tainted most by the fact that Keller had admitted that he had killed "that lady" during his first interview, as found by the trial court. Once he had admitted such a thing, which is the very essence of the crime at issue, it seems much more likely that in subsequent interviews he would not be as likely to deny it. From his perspective, he already had told police that he had killed someone. There was little else for him to tell, so why not just keep talking to them after that? He had no way of knowing that his first statement was taken in

One wonders why the police did not ask him to sign a ***Miranda*** waiver form.

92

violation of *Miranda* under arguably coercive circumstances. I would find that the first confession from the first coercive interview impermissibly tainted the third statement. The State did not purge the taint by rereading to Keller the *Miranda* warning in an environment other than the emergency room.

¶191.  The majority cites the United States Supreme Court to counter this proposition, stating, "a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *U.S. v. Bayer*, 331 U.S. 532, 540-41, 67 S. Ct. 1394, 1398, 91 L. Ed. 1654 (1947). However, in that case, the second confession occurred *six months* after the first. *Id.* at 541. Here, Keller had told police less than half a day earlier that he indeed had shot "that lady." He was still in the hospital, with a tube in one lung, and had, hours before, been injected with morphine. I find that his subsequent confession in the third statement was a fruit of the poisonous tree, and was inadmissible at his trial.

> **III.  Even if it was not impermissibly tainted, Keller's third statement was given without an express waiver of Keller's *Miranda* rights, and should not have been admitted.**

¶192.  When Keller was approached for the third time, a few hours after having a tube placed into his chest, the investigating officer read him the *Miranda* rights. As noted by the majority, Officer Brown read Keller the following rights:

> BROWN: I'd like to read you your rights. I know you said you would agree to talk to us, but I gotta do that anyway. You know you have the right to remain silent, anything you say . . . can and will be used against you in court or any other judicial or administrative proceedings. You have the right to speak to an attorney prior to any questions. You may have an attorney with you during questioning. If

93

you desire an attorney and cannot afford one, one will be appointed for you free of charge. And if you decide to answer questions now, without an attorney present, you still have the right to stop the questioning at any time and request that an attorney may be made available to you. Do you understand all that?

KELLER:     I understand.

¶193. What is missing from that exchange is an explicit waiver. It is true, as noted by the majority, that the United States Supreme Court has held that, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S. Ct. 2250, 2262, 176 L. Ed. 2d 1098 (2010).  While this case stands for the proposition that, under federal law, investigators may proceed on the basis of an implied waiver, Mississippi is completely free to hold itself to a higher standard and require an express waiver. The individual states must look to their own jurisprudence to determine whether state law requires a higher standard than that mandated by the federal government. *See Commonwealth v. Clarke*, 960 N.E.2d 306, 311 (Mass. 2012) ("[I]n the prewaiver context, art. 12 [of the Massachusetts state constitution] does not require a suspect to invoke his right to remain silent with the utmost clarity, as required under Federal law.").  While there is no requirement that a waiver must be in writing, nevertheless, a waiver must occur under our jurisprudence. "All that is required is that the accused be afforded the protection of the *Miranda* warning and thereafter knowingly and intelligently *waive* his rights and freely and voluntarily make the statement." *Ruffin v. State*, 992 So. 2d 1165, 1171 (Miss. 2008) (emphasis added) (citing *Davis v. State*, 320 So. 2d 789, 790 (Miss. 1975)). We clearly require that a suspect *waive* his *Miranda* rights in order that they be deemed abandoned. This State has not

adopted the holding in ***Thompkins***, and I do not agree with the majority that it should now. Our jurisprudence requires a waiver, not an indication that the rights merely are understood. Therefore, I would find that the third statement was taken in violation of this Court's ***Miranda*** jurisprudence and was inadmissible at trial.

¶194. I would reverse and remand Keller's capital murder conviction and sentence. His confession was a large piece of the State's case against him, and it was obtained, in my opinion, in violation of his rights to due process of law and against self incrimination. None of his statements, which occurred during a process of police interrogation, should have been admitted. This Court should not have taken the extraordinary step, in the middle of an appeal, of affording the prosecution an unprecedented opportunity to patch up the holes in its case. This Court should have decided this case a year ago, in the normal manner, with the record that was before it at the time, and it should have reversed Keller's conviction and remanded his case for a trial which does not include any of Keller's statements. For the foregoing reasons, I respectfully dissent.

**KING, J., JOINS THIS OPINION**.

## APPENDIX

## DEATH CASES AFFIRMED BY THIS COURT

*Leslie Galloway III v. State*, 122 So. 3d 614 (Miss. 2013).

*Bobby Batiste v. State*, 121 So. 3d 808 (Miss. 2013).

*Roger Lee Gillett v. State,* 56 So. 3d 469 (Miss. 2010).

*Moffett v. State,* 49 So. 3d 1073 (Miss. 2010).

*Pitchford v. State,* 45 So. 3d 216 (Miss. 2010).

*Goff v. State*, 14 So. 3d 625 (Miss. 2009).

*Wilson v. State*, 21 So. 3d 572 (Miss. 2009).

*Chamberlin v. State*, 989 So. 2d 320 (Miss. 2008).

*Loden v. State,* 971 So. 2d 548 (Miss. 2007).

*King v. State*, 960 So. 2d 413 (Miss. 2007).

*Bennett v. State*, 933 So. 2d 930 (Miss. 2006).

*Havard v. State*, 928 So. 2d 771 (Miss. 2006).

*Spicer v. State*, 921 So. 2d 292 (Miss. 2006).

*Hodges v. State*, 912 So. 2d 730 (Miss. 2005).

*Walker v. State*, 913 So. 2d 198 (Miss. 2005).

*Le v. State*, 913 So. 2d 913 (Miss. 2005).

*Brown v. State*, 890 So. 2d 901 (Miss. 2004).

*Powers v. State*, 883 So. 2d 20 (Miss. 2004)

*Branch v. State*, 882 So. 2d 36 (Miss. 2004).

*Scott v. State*, 878 So. 2d 933 (Miss. 2004).

*Lynch v. State*, 877 So. 2d 1254 (Miss. 2004).

*Dycus v. State*, 875 So. 2d 140 (Miss. 2004).

*Byrom v. State*, 863 So. 2d 836 (Miss. 2003).

*Howell v. State*, 860 So. 2d 704 (Miss. 2003).

*Howard v. State*, 853 So. 2d 781 (Miss. 2003).

*Walker v. State*, 815 So. 2d 1209 (Miss. 2002). *following remand.

*Bishop v. State*, 812 So. 2d 934 (Miss. 2002).

*Stevens v. State*, 806 So. 2d 1031 (Miss. 2002).

*Grayson v. State*, 806 So. 2d 241 (Miss. 2002).

*Knox v. State*, 805 So. 2d 527 (Miss. 2002).

*Simmons v. State*, 805 So. 2d 452 (Miss. 2002).

*Berry v. State*, 802 So. 2d 1033 (Miss. 2001).

*Snow v. State*,  800 So. 2d 472 (Miss. 2001).

*Mitchell v. State*, 792 So. 2d 192 (Miss. 2001).

*Puckett v. State*, 788 So. 2d 752 (Miss. 2001). * following remand.

*Goodin v. State*,  787 So. 2d 639 (Miss. 2001).

*Jordan v. State*, 786 So. 2d 987 (Miss. 2001).

*Manning v. State*, 765 So. 2d 516 (Miss. 2000). *following remand.

*Eskridge v. State*, 765 So. 2d 508 (Miss. 2000).

*McGilberry v. State*, 741 So. 2d 894 (Miss. 1999)*.*

*Puckett v. State*, 737 So. 2d 322 (Miss. 1999). *remanded for *Batson* hearing.

*Manning v. State*, 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State*, 735 So. 2d 238 (Miss. 1999).

*Turner v. State*, 732 So. 2d 937 (Miss. 1999).

*Smith v. State*, 729 So. 2d 1191 (Miss. 1998).

*Burns v. State*, 729 So. 2d 203 (Miss. 1998).

*Jordan v. State*, 728 So. 2d 1088 (Miss. 1998).

*Gray v. State*, 728 So. 2d 36 (Miss. 1998).

*Manning v. State*, 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State*, 726 So. 2d 524 (Miss. 1997).

*Bell v. State*, 725 So. 2d 836 (Miss. 1998).

*Evans v. State*, 725 So. 2d 613 (Miss. 1997).

*Brewer v. State*, 725 So. 2d 106 (Miss. 1998).

*Crawford v. State*, 716 So. 2d 1028 (Miss. 1998).

*Doss v. State*, 709 So. 2d 369 (Miss. 1996).

*Underwood v. State*, 708 So. 2d 18 (Miss. 1998).

*Holland v. State*, 705 So. 2d 307 (Miss. 1997).

*Wells v. State*, 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State*, 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State*, 684 So. 2d 1179 (Miss. 1996).

*Davis v. State*, 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581 (Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

***Shell v. State**, 554 So. 2d 887 (Miss. 1989); **Shell v. Mississippi,** 498 U.S. 1 (1990) reversing, in part, and remanding; **Shell v. State**, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

***Pinkney v. State**, 538 So. 2d 329 (Miss. 1989); **Pinkney v. Mississippi**, 494 U.S. 1075 (1990) vacating and remanding; **Pinkney v. State**, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

*Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi*, 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So.  2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

***Bell v. State***, 360 So. 2d 1206 (Miss. 1978).

     \*Case was originally affirmed in this Court but on remand from U. S. Supreme  Court, case was remanded by this Court for a new sentencing hearing.

**DEATH CASES REVERSED AS TO GUILT PHASE
<u>AND SENTENCING PHASE</u>**

*Ross v. State,* 954 So. 2d 968 (Miss. 2007).

*Flowers v. State,* 947 So. 2d 910 (Miss. 2006).

*Flowers v. State,* 842 So. 2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So. 2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So. 2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State,* 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

**DEATH CASES REVERSED**
**AS TO PUNISHMENT AND REMANDED**
**FOR RESENTENCING TO LIFE IMPRISONMENT**

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

*Fulgham v. State,* 46 So. 3d 315 (Miss. 2010).

*Rubenstein v. State,* 941 So. 2d 735 (Miss. 2006).

*King v. State,* 784 So. 2d 884 (Miss. 2001).

*Walker v. State,* 740 So. 2d 873 (Miss. 1999).

*Watts v. State,* 733 So. 2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

\**Shell v. State*, 554 So. 2d 887 (Miss. 1989); *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding; *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

\**Pinkney v. State*, 538 So. 2d 329 (Miss. 1989); *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding; *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

\**Clemons v. State*, 535 So. 2d 1354 (Miss. 1988); *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding; *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

\**Jones v. State*, 517 So. 2d 1295 (Miss. 1987); *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding; *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

***Holland v. State***, 587 So. 2d 848 (Miss. 1991).

***Willie v. State***, 585 So. 2d 660 (Miss. 1991).

***Ladner v. State***, 584 So. 2d 743 (Miss. 1991).

***Mackbee v. State***, 575 So. 2d 16 (Miss. 1990).

***Berry v. State***, 575 So. 2d 1 (Miss. 1990).

***Turner v. State***, 573 So. 2d 657 (Miss. 1990).

***State v. Tokman***, 564 So. 2d 1339 (Miss. 1990).

***Johnson v. State***, 547 So. 2d 59 (Miss. 1989).

***Williams v. State***, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

***Lanier v. State***, 533 So. 2d 473 (Miss. 1988).

***Stringer v. State***, 500 So. 2d 928 (Miss. 1986).

***Pinkton v. State***, 481 So. 2d 306 (Miss. 1985).

***Mhoon v. State***, 464 So. 2d 77 (Miss. 1985).

***Cannaday v. State***, 455 So. 2d 713 (Miss. 1984).

***Wiley v. State***, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, ***Wiley v. State***, 484 So. 2d 339 (Miss. 1986); *cert. denied,* ***Wiley v. Mississippi***, 479 U.S. 1036 (1988); resentencing ordered, ***Wiley v. State,*** 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to ***Wiley v. Puckett***, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed.

***Williams v. State***, 445 So. 2d 798 (Miss. 1984).  *Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.